J-A04037-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | | |
|---|---|---|---|
| I.A. | : | IN THE SUPERIOR COURT OF | |
| | : | PENNSYLVANIA | |
| | : | | |
| v. | : | | |
| | : | | |
| | : | | |
| K.F. | : | | |
| | : | | |
| Appellant | : | No. 1723 EDA 2020 | |

Appeal from the Order Entered August 28, 2020
In the Court of Common Pleas of Bucks County Civil Division at No(s):
No. 2016-60952

BEFORE:  STABILE, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:             **FILED:  MARCH 4, 2021**

K.F. (Father) appeals from the order entered in the Court of Common Pleas of Bucks County (trial court) awarding sole legal custody and primary physical custody of the parties' minor children (K.F. daughter, age 11) and J.F. (son, age 8) (collectively "Children") to I.A. (Mother).  After a thorough review, we affirm.

**I.**

This case has a protracted and contentious history.  We take the following factual background and procedural history from our independent review of the certified record and the trial court's October 20, 2020 opinion.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Mother and Father married in 2005. K.F. was born in 2008 and J.F. was born in 2011. Mother and Father legally separated in August 2015. On June 1, 2016, the court entered an interim custody order granting the parties shared legal custody of the Children, with Mother having primary physical custody and Father partial physical custody. On January 12, 2017, Mother filed a complaint for custody and, following a custody conference, an interim custody order was entered on March 13, 2017, wherein the parties agreed to continue the existing schedule and participate in a custody evaluation by the Bucks County Custody Conciliation and Evaluation Service (CCES). The parties also stipulated that the trial court would receive a copy of the evaluator's report and would be permitted to rely on its recommendations and findings. On July 13, 2017, a CCES report (2017 CCES Report) was issued citing to a significant amount of conflict between the parties affecting their ability to co-parent the Children and to K.F.'s perception that Father favors J.F. over her.

After a September 29, 2017 custody trial, the court entered a final custody order granting the parties shared legal custody and Mother primary physical custody. Pursuant to the order, Father's partial custodial time during the school year was every other weekend from Saturday at 9:30 a.m. until Sunday at 7:30 p.m., with a dinner visit every other Wednesday from after school until 7:30 p.m. During the summer, Father's partial physical custody was from Thursday after camp until Monday morning, with a midweek

overnight on Wednesdays. The same day, Mother filed a petition for contempt and to modify custody that she later withdrew.

On June 4, 2019, Father filed a petition for modification of a custody order seeking primary physical custody of the Children. After a July 11, 2019 custody conference, the matter was listed for trial on October 3, 2019. In the interim, on September 24, 2019, Mother filed an answer to Father's modification petition and her own petition for modification of a custody order. At the scheduled October 3, 2019 custody trial, the parties again agreed to participate in a CCES evaluation.

**A.**

CCES custody evaluator, Catherine Danilo, LCSW, conducted the evaluation during which Father sought shared physical custody and Mother sought to continue the school year custodial schedule year-round. In her March 26, 2020 report (2020 CCES Report), Ms. Danilo observed, in pertinent part, that K.F. stated that transitioning between her parents' homes was difficult for her. She described Mother's home as "bright and cheery" and Father's home as "dark because he tries to save on electricity[.]" (2020 CCES Report, at 9). J.F. explained that he did not want additional time with Father and was satisfied with the visitation schedule. (**See id.**). Ms. Danilo observed that most of Father's attention was directed to J.F. and that K.F. was secondary to him, with him compromising their relationship by missing "opportunities to take delight" in her. (**Id.** at 14). Ms. Danilo noted that

increasing Father's time would result in "an attention-imbalance [wherein K.F.] perceives herself to be secondary" to J.F. (*Id.* at 4).

Ms. Danilo reported that J.F. received an Individualized Education Plan (IEP) during the 2018-2019 school year in the Central Bucks School District. Mother also obtained services for him through the Lenape Valley Foundation, which provides him additional assistance before and after school. Because J.F. can be sensitive to class size, Mother arranged for him to have one-on-one karate classes. Although J.F. did take swimming lessons, they have been inconsistent when with Father. (*See id.* at 10-11).

She reported that according to school staff, J.F. has improved with the intervention and support of the school and Lenape Valley Foundation. According to school staff, J.F. does better with consistency and structure. (*See id.* at 14).

For example, Rebekah Detweiler, The Learning Support Case Manager at J.F.'s elementary school, reported that J.F. does well when in a consistent routine and that he "thrives in a predictable environment." (*Id.* at 11). Both parents attended an IEP meeting which Ms. Detweiler described as "memorable" due to the level of J.F.'s distress. (*Id.* at 12). He cried and clung to Mother who unsuccessfully tried to console him, thus causing the meeting to be rescheduled. Father did not attempt to intervene.

Helena Donaghy, a behavioral consultant with Lenape Valley Foundation, reported to Ms. Danilo that she writes treatment plans and

devises strategies to assist J.F. to engage in appropriate behaviors. She communicates with Mother regularly, but her attempts to contact Father have been less successful because he is less responsive. (**See id.** at 12). She explained that J.F. "becomes distressed and has meltdowns when he experiences a change in schedule." (**Id.** at 13).

Ms. Danilo reported that Mother and Father "are unable to successfully engage in communication that supports co-parenting and healthy child development" and that Father is unaware of the Children's socio-emotional needs. (**Id.** at 16). She also mentioned that despite their difficulties, Mother reported that in an attempt to support the Children, she purchases birthday cards from them for him and attempts to contact him to arrange visits on holidays. (**See id.** at 17).

She recommended that Mother and Father continue to share legal custody but observed that "[t]his suggestion is challenging, specifically in regard to moral support, as [Mother and Father] have very different ways of offering emotional support." (**Id.** at 21). She recommended Mother continue to exercise primary physical custody and Father exercise partial physical custody, with a year-round schedule of every other weekend and a weekly dinner with the Children. She reiterated that "structure and consistency" is particularly important for J.F. and that a new schedule suggested by Father would not be in the best interest of the Children. (**Id.** at 20; **see id.** at 21).

**B.**

On April 14, 2020, Father filed defendant's motion/petition for emergency relief-custody seeking sole physical custody until the severity of the Covid-19 pandemic is substantially reduced. He also sought a modification to shared physical custody upon the pandemic's abatement. He asserted that because Mother is a nurse anesthetist, she and the Children were at a greater risk for contracting Covid-19.

Mother filed a motion for custody hearing on June 29, 2020, and a trial was scheduled for August 13, 2020. On August 7, 2020, Mother filed an emergency petition to modify custody order in which she sought sole legal custody due to Father's alleged refusal to cooperate with decision-making. On August 12, 2020, Father filed a reply to Mother's petition and an emergency motion/petition seeking sole physical and legal custody of the Children.

At the August 13, 2020 trial, the parties agreed to have the court consider all open claims. Each of the parties testified and presented evidence and the court conducted an *in camera* interview of K.F.[1] The parties provided the following testimony and evidence pertinent to Father's issues.

_____

[1] Mother and Father agreed not to be at the interview and, despite being given the opportunity to provide questions, did not do so. The certified record does not contain the notes of testimony for this *in camera* interview. However, this does not impede our review because the record contains sufficient evidence on which the court relied for us to conduct our analysis.

## C.

Father said he was seeking primary legal and physical custody of the Children because Mother is a "nurse [] working in a hospital during the global pandemic," for the safety of the Children, "specifically these incidents where complaints of nausea and a fever," J.F.'s school performance and the Maternal Grandmother "who is in her mid-70s who has health problems attending to the [C]hildren." (N.T. Trial, 8/13/20, 33). He said that he never leaves home except to get gas, he has a Master's Degree in computer engineering so he can "provide the [C]hildren with an advanced learning environment," and can resolve J.F.'s behavioral problems identified in the IEPs. (*Id.* at 35). He did not believe that Mother could provide J.F. with the support he needed to succeed in school like he could. (*See id.* at 45). He said if the custody schedule remained the same, the Children would "continue to have health issues" because Mother works in a hospital and could be asymptomatic for Covid-19. (*See id.* at 44-45). Father did not believe co-parenting counseling would be helpful. (*See id.* at 41).

More specifically, Father testified about his concerns regarding J.F. because he has autism that impacts his behavior. (*See id.* at 9). He testified that the 2020 IEP noted that J.F. was regressing, violent and acting out in class. (*See id.* at 9-10). He voiced concern that J.F. would have difficulty to adhere to the Covid-19 safety protocols at school and he preferred that the Children remain in virtual learning if given the option both for J.F.'s special

needs and their safety in general. (**See id.** at 10-13). He did not want the Children in before- or after-care if they went back to in-person learning and stated that Mother registered them for it unilaterally for the 2020-2021 school year. (**See id.** at 13-15, 38-39). Father testified that he works from home and has a Master's Degree in Computer Engineering and that this would enable him to assist the Children with online learning, especially J.F., who required "an extensive amount of support." (**Id.** at 16; **see id.** at 15-16).

Father testified about J.F.'s June 12, 2019 and June 5, 2020 IEP reports. The objective of the documents was for J.F. to improve his behavior at school. (**See id.** at 17-20). The June 2, 2020 IEP contained reports of J.F. acting out and reflected that he did not meet his safety objectives, but Father conceded that he got his work done at home with the help of Mother and met his academic success objectives. (**See id.** at 23-24, 64-66). Father's concern was that, according to the IEPs, J.F. was not spending all his time in class and his behavioral issues were taking away from his education and could result in him hitting a teacher and being arrested. Father stated that if J.F. stayed with him, he could resolve J.F.'s behavioral problems so that he would spend more time learning and that he does not exhibit any behavioral problems when in Father's care. (**See id.** at 21-22, 24-25, 44-45). Father maintained that because J.F. spends the school day in Mother's custody, he cannot focus on educational issues with him, but he does try to use positive reinforcement with workbooks, reading materials and education toys. (**See id.** at 22-23, 25, 58-

59). He said J.F. told him that he prefers doing online learning over going to school. (*See id.* at 26). J.F. virtually attended a weekly summer session of school in 2020, and Father did one session with him, but did not offer to do more because of the custody schedule. (*See id.* at 61-62). When asked if he had any concerns regarding academics, Father said that his concern was for J.F. and not K.F., because she gets straight As. (*See id.* at 24, 54-55).

Father testified that he did not know Mother's work schedule and did not know what she does daily or whether she had interactions with Covid-19 patients, and he has not asked her. (*See id.* at 28-29). He said Mother returned to work full-time in mid-March after taking a leave of absence and that she, therefore, was unable to help the Children with online learning because she is unable to work from home. (*See id.* at 33-35, 54).

When Mother is at work, the Children are in the care of their Maternal Grandmother who lives with them, but who provides no assistance to the Children in their virtual schooling, is in her 70s and falls asleep while the Children are in her care, rendering her an unsuitable caregiver for them. (*See id.* at 30-31, 33-34). Father testified that when the parties were married, Maternal Grandmother lived with them and he had to evict her from the house for her violent behavior. (*See id.* at 41).

He testified that he picked up J.F. for a weekday visit and he had a ninety-nine-degree fever that had not been detected at Mother's house and that K.F. often has nausea of which Mother is aware. (*See id.* at 29-32, 66).

He did not take either of the Children to the doctor for their symptoms. J.F.'s fever came down after giving him Tylenol and he assumed Mother took K.F. to the doctor since she was aware of the stomach issues and that it could be Covid-19. (*See id.* at 40, 66, 69). In response to K.F.'s stomach issues, he emailed Mother to tell her that K.F. was getting sick from her because she works in a hospital and could have asymptomatic Covid-19. (*See id.* at 68-69); (Exhibit M-1, Feb. 26, 2020 Email Chain). He said that fever and nausea are symptoms of Covid-19, but to his knowledge, neither of the Children has been tested for it and neither has he. (*See* N.T. Trial, at 32, 69-70). He did not suggest to Mother that the Children get tested for Covid-19 because she is a nurse anesthetist and the Children are on her insurance. (*See id.* at 70-72).

Father testified that he has no reason to believe that Mother is not exercising safety protocols with the Children and, although Mother took them to a farm on the Fourth of July, he did not know if it was a large gathering. (*See id.* at 51-52). Neither Child has told Father that Mother seems ill. (*See id.* at 52).

Father testified that the Children are happier in the summer when they spend more time with him because they are sleep deprived at Mother's house during the school year. (*See id.* at 42-43). He said that the IEP stated that one of the reasons J.F. has behavioral problems is because he is tired, but he

admitted on cross-examination that the IEP did not use the term "sleep deprivation" or attribute any tiredness to Mother. (**See id.** at 42, 55-56).

He maintained that Mother requested that he agree to enroll K.F. in a summer camp at their church where there had been a shooting approximately two years prior. (**See id.** at 36-37). He would not agree for safety reasons and stated that she did not go after Mother "unilaterally enrolled [her] … without [his] consent[.]" (**Id.** at 38); (**see also** Exhibit M-2, February 2, 2020 Email Chain). He was not aware of any issues with the Children's extracurricular activities and he brought them to the YMCA to play before the pandemic. (**See id.** at 47). When asked about issues about signing documents from the school, Father responded that he has not missed any deadlines. (**See id.** at 35).

**D.**

Mother said she was moving for sole legal custody because Father is not interested in co-parenting. His reaction to anything she asks of him is to say no or say the opposite of what she says. Furthermore, despite telling J.F.'s school psychologist that he wanted to be involved in everything, Father would delay forms that he needed to sign. For example, the school wanted to discuss autism with J.F.'s classmates to teach them about it so that they could understand what he was going through, but Father said no. When the school district was able to make contact with him two weeks later, he said yes, with stipulations, but it was too late, so the discussion at school never happened.

(*See id.* at 118-20). She takes the Children to all doctors' and dental appointments and signs the forms because he shows no interest. When she asked Father to take the Children to a flu clinic that fell on his weekend, he declined to do so, but then blamed her later for not getting the vaccination sooner. (*See id.* at 120-23); (Exhibit M-5, Email Chain regarding Flu Clinic). She did not believe that Father had any interest in raising K.F., only J.F. (*See id.* at 124).

More specifically, Mother testified that she had J.F.'s 2019 IEP performed at the Central Bucks School District because she noticed he had concerning behaviors going from a small kindergarten to a larger first grade class, and that is when it was discovered he was on the autism spectrum. (*See id.* at 94-95). She stated that his performance improved once the IEP was put in place and that no one has ever advised her that he is sleep deprived. (*See id.* at 95). Although his behavior regressed over the summer before second grade, it greatly improved during the school year before the pandemic closed the school. (*See id.*). During the fall of 2019, he received occupational and speech therapies and social skills lessons in person and, once Covid-19 hit, his services went virtual. (*See id.* at 97-98). Mother testified that she maintains contact with his support staff members whether he is seeing them virtually or in person, and with his teacher during the school year. (*See id.* at 100-01). She said that, although J.F. needs redirection sometimes, he has done well with virtual classes. (*See id.* at 101-02). She

has attended four out of five of J.F.'s support sessions and the one that she missed was because it was on a day Father was supposed to have visitation and there was confusion about who would log J.F. on for it. (*See id.* at 102). Mother testified that J.F.'s second year grades were great, with him able to achieve all goals both during the school year and in his summer academic program. (*See id.* at 103); (*see also* Exhibit M-3, 2019-2020 Second Grade Report Card); (Exhibit M-4, Summer 2020 Report Card). Mother had taken a leave of absence from work for Spring 2020 and had already spoken with her employer about taking one in Fall 2020 to help with J.F.'s virtual learning. (*See* N.T. Trial, at 107-08).

As to the Covid-19 pandemic, Mother testified that she has been vigilant in her employment as a nurse anesthetist. (*See id.* at 108). She is not on a Covid-19 unit and neither she nor her colleagues have contracted Covid-19. (*See id.* at 111). On cross-examination, when asked whether she had ever been tested for Covid-19, Mother also said no. She stated that while she was out on leave, a random group of her colleagues had been tested and all came back negative. (*See id.* at 127).

She is provided with new full Personal Protective Equipment (PPE) each day and maintains social distancing, not even going into the lunchroom. (*See id.* at 112). All patients that come into Abington Hospital are tested before she has any access to them. (*See id.* at 110). If they test positive for Covid-19, they have special procedures in place that keep any virus out. (*See id.*

at 111). She stated that she took time off during the spring surge and only worked part-time while the Children were in school, going back to her regular thirty-six hours per week the first week of July. (*See id.* at 111, 127). On cross-examination, Mother said she would go on leave again when school started, and that she was prepared to go back part-time if the school stayed virtual beyond its then-scheduled November 11, 2020 return date. (*See id.* at 128-29).

She sanitizes everything at the house and rarely takes the Children out of the home and, if she does, they are masked, and there is usually only one or two other individuals present, such as J.F.'s support team members. (*See id.* at 108-09). Mother testified that she has taken every precaution possible, including as instructed by the CDC to protect herself and the Children from Covid-19. (*See id.* at 112). J.F.'s karate was virtual and, since returning to in-person lessons, they are one-on-one. (*See id.* at 109).

She testified that Father has never reached out to her with any Covid-19 concerns, including that he thought J.F. had a symptom of the virus. (*See id.* at 115). As for K.F., Mother said that her daughter usually comes back from Father's home complaining of stomach pains and Mother gives her tea or ginger ale to calm her stomach. (*See id.* at 114-15). Mother believed these stomach issues were caused by the amount of fast food K.F. was eating while with Father and from stress. (*See id.* at 116).

Mother stated that she has difficulty getting in contact with the Children when they are at Father's house because her phone number has been blocked on his house phone for at least three years. (*See id.* at 116-17). K.F. must call her because even if Mother tries to call Father's cell phone, it goes to voicemail or "clicks off." (*See id.* at 117).

**E.**

At the conclusion of the trial, the court reviewed each of the sixteen custody factors on the record. (*See id.* at 137-45). It found that eight factors favored Mother, one factor favored Father and the remaining factors were neutral. (*See id.*; *see also* Trial Court Opinion, 10/20/20, at Exhibit B, Summary of Analysis of Custody Factors). On August 27, 2020, the Court entered an order awarding sole legal and primary physical custody to Mother.

Father timely appealed and filed a Rule 1925(b) statement of errors on appeal.[2] The trial court filed a Rule 1925(a) opinion on October 20, 2020. *See* Pa.R.A.P. 1925.

---

[2] Father's notice of appeal was defective where he failed to file a statement of errors complained of on appeal contemporaneously with his children's fast track notice of appeal in violation of Rule 1925(a)(2)(i). *See* Pa.R.A.P. 1925(a)(2). However, Father filed it before the court entered its order directing to do so and Mother has not claimed she was prejudiced by the procedural error. Therefore, it was harmless, and we will not consider his issues waived. *See In re Adoption of N.N.H.*, 197 A.3d 777, 781 n.6 (Pa. Super. 2018) (failure to file Rule 1925(b) statement with children's fast track notice of appeal harmless error when appellant timely complied with trial court order directing her to do so and there was no prejudice).

Father challenges the court's grant of sole legal and primary physical custody to Mother and the partial custody schedule he was awarded, which he separates into six separate questions.

1.     Did the lower court err by granting sole legal custody to Mother?

2.     Did the court err by failing to acknowledge the fact that the parties' younger child is autistic and requires additional support?

3.     Did the court err by failing to include any provisions in the order to protect the Children from exposure to Covid-19 given the fact that Mother is employed as a nurse anesthetist and interacts with Covid-19 patients and other patients that may unknowingly have Covid-19?

4.     Did the court err by failing to establish a custodial schedule that considered the fact that Father works from home and that would allow [him] to have custody of the Children during school days to allow [him] to provide necessary assistance to the parties' Children, primarily the parties' autistic child, for their online educational needs?

5.     Did the trial court err by reducing Father's partial physical custody during the summer?

6.     Did the court err by not giving sufficient weight to the IEP reports and report card that indicated significant behavioral problems and academic performance of the parties' younger child that have not been appropriately addressed and corrected?

(Father's Brief, at 17-20)[3] (unnecessary capitalization omitted).[4]

## II.

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical,

---

[3] "In reviewing a custody … order, our scope is of the broadest type and our standard is an abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law or are unreasonable in light of the sustainable findings of the trial court." *C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

[4] We note at the outset that Father's sixty-nine-page brief only contains four legal citations-one case for our standard of review, one in support of the proposition that "shared custody allows both parents input into major decisions in the child's life[]" and citations to the Domestic Relations Code. (Father's Brief, at 26; *see id.* at 2, 53). He fails to provide any pertinent legal citation and discussion thereof in support of his specific arguments about what the trial court should have done, but merely recites the evidence in the light most favorable to him and effectively asks us to reweigh it, which ignores our standard of review and is something we will not do. (*See id.* at 17-69); *see also C.R.F.*, *supra* at 443; Pa.R.A.P. 2119(a) ("The argument shall … [contain] such discussion and citation of authorities as are deemed pertinent."). Hence, Father's appeal could be deemed waived. *See Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa. Super. 2002) ("Without a reasoned discussion of the law against which to adjudge the [appellant's] claims, our ability to provide appellate review is hampered."); *see also* Pa.R.A.P. 2101. However, because we can discern Father's arguments, we decline to find waiver.

intellectual, moral, and spiritual well[-]being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted). Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340. Specifically, when deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the relevant Section 5328(a) factors. *See E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011). "All of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011)(emphasis omitted). Section 5328(a) provides:

> In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

**A.**

In his first issue, Father argues that the trial court erred in awarding Mother sole legal custody[5] of the Children. He maintains that "[t]he award of sole legal custody to Mother was a punitive measure to Father for requesting that he have sole physical custody of the Children while Covid-19 … remains a deadly pandemic[.]" (Father's Brief, at 26-27). The crux of Father's argument is that Mother makes poor decisions regarding the Children's safety such as registering them for before- and after-school care during Covid-19 and wanting to send K.F. to a summer camp where there had been a previous shooting. He disputes that he has been resistant to co-parenting.

Father's claim that the court made its legal custody decision to be punitive is disputed by the court's thorough review and detailed explanation of the evidence on which it relied. Specifically, as previously noted both on the record and in Exhibit B to its opinion, the trial court addressed all sixteen of the custody factors, as well as providing a thorough review in its August 27, 2020 order and in its opinion with this Court. (**See** N.T. Trial, at 136-45); (Trial Court Order, 8/27/20, at 1-5, n.1); (Trial Ct. Op., at Exhibit B). It found that Custody Factors One (likelihood to encourage frequent contact between child and other parent) and Thirteen (conflict between the parties and

_____

[5] The Child Custody Act defines legal custody as "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." 23 Pa.C.S. § 5322.

willingness to cooperate) significantly supported its decision to grant sole legal custody to Mother. (***See*** Trial Ct. Op., at Exhibit B, at 1, 10-11).

It explained as to factor one that:

> Mother reported to the custody evaluator that she sent birthday and holiday cards to Father from the Children and also attempts to arrange contact with him and the Children on celebratory days. Father did not dispute this at trial. Also, Father did not present evidence that Mother has engaged in conduct that has interfered with his ability to have contact with his Children while they are in her custody. Mother, however, testified that her daughter has to call her when she is with Father because Father has blocked Mother's number from his landline and does not usually respond to her calls when made to his cell phone. She testified that usually the call goes right to his voicemail or is "clicked off." K.F. also noted in her judicial interview that she wants to be able to FaceTime Mother while in Father's custody, but Father discourages such contact with Mother.

(***Id.*** at 1).

With respect to factor thirteen, the court explained:

> The level of conflict between the parties in this matter is high and has been high for the past few years. The result of this has been an inability to effectively communicate and co-parent going back to at least 2017. It appears from the 2017 CCES Report that both parties at that time contributed significantly to their communication problems. Based upon the admissible evidence presented at the trial, however, it appears that Mother has taken steps to reduce her contributions to this communication problem. Father, however, continues to be either non-responsive to Mother or intransigent to her requests or suggestions. Unfortunately, this unwillingness on the part of Father has manifested in lost benefits to the Children, including an evaluation of K.F. for depression because Father refused to sign consents, and a lost opportunity for J.F.'s class to learn about his autism because Father delayed in providing his consent for a class presentation/meeting. Father's testimony and demeanor toward Mother at trial demonstrated to the court his unwillingness to cooperate is not likely to resolve any time soon. The court has serious concerns that as a result, the Children will continue to be

harmed by Father's intransigence flowing from the acrimony that he continues to hold toward Mother.

(***Id.*** at 10-11) (unnecessary capitalization omitted).

In summary, the court observed:

Based upon the admissible evidence and its credibility determinations, the court concluded that the parties currently are unable to co-parent and/or timely make important decisions for the Children.  As a result, the court was forced to identify which parent was the more appropriate choice to have sole legal custody.  The court concluded that Mother was that parent.  The decision was not made to punish Father.  It was motivated solely by what is in the best interest of the parties' Children, and it was based upon the admissible evidence presented, including that which demonstrated Mother to be the parent more likely to share information with, and respond to, the other parent, and the parent more likely to initiate and sustain contact with the professionals supporting J.F.

(Trial Ct. Op., at 14) (unnecessary capitalization omitted).

Our independent review of the record supports the trial court's findings. Mother solicited input on enrolling K.F. in camp, and Father shut down all communications on the topic.  Mother's credible testimony established that Father delays in signing forms to the detriment of the Children, does not respond to communications about dental and medical appointments, blocked Mother's phone number on his landline, and when she calls his cell phone, he usually does not pick up.

The 2020 CCES Report reflects that Mother provided Ms. Danilo with emails between her and Father regarding the Children and many of them indicated no response by Father, that school staff and professionals supporting J.F. reported having less contact with Father overall, and that he was less

responsive than Mother.  Similarly, Father only reluctantly signed consents for Ms. Danilo to complete her evaluation.  In contrast, Ms. Danilo reported emails between Mother and school staff and behavioral support personnel that occurred regularly.

The court found Mother's testimony credible, straightforward, consistent on cross and direct examination and supported by corroborated exhibits.  (**See** Trial Ct. Op., at 12-13).  Conversely, the court had "some credibility concerns" regarding Father due to his exaggerations about sleep deprivation, the Children's likelihood of having continuing health issues if they stayed with Mother and the fact that, despite these alleged health concerns, Father failed to take the Children to the doctor, get them a Covid-19 test or speak to Mother about getting them one.  (**Id.** at 13).

Based on the foregoing, competent evidence of record supports the court's decision to grant Mother sole legal custody.  Father's first issue lacks merit.

### B.

Father's second through sixth issues challenge the trial court's grant of primary physical custody[6] to Mother and the visitation schedule granted to him.  (**See** Father's Brief, at 17-19, 49-68).  He argues that the court abused its discretion in its order for physical custody because it failed to acknowledge

---

[6] The Child Custody Act defines physical custody as "[t]he actual physical possession and control over a child."  23 Pa.C.S. § 5322.

that J.F. requires additional support due to his autism, which Mother is unable to give; should have considered the risks associated with giving Mother primary physical custody during the Covid-19 pandemic where she is a nurse anesthetist; failed to establish a custodial schedule that considered that Father works from home; erred in reducing Father's partial custody during the summer; and failed to give sufficient weight to IEP reports and J.F.'s report card. (**_See id._**).

As a preliminary matter, Father's claims that the court failed to consider all relevant evidence when making its decision is belied by the record. As we previously observed, the court addressed all sixteen custody issues and has provided detailed explanations for its decisions. We find any claim by Father that the court failed to thoroughly consider all evidence in front of it specious at best where the court provided such a painstaking review.

However, we provide the following independent review of the court's findings.

**1.**

As to his claim regarding the court's alleged failure to acknowledge J.F.'s autism, we observe that, in its opinion, the court explained:

> Contrary to Father's belief, in considering which parent is more likely to meet the educational and special needs of the Children, the court absolutely did consider that J.F. is autistic and requires additional support. And, in fact, the court heavily considered which party would be more likely to put in the work necessary to make sure that J.F. continued to receive that additional support.

- 24 -

The evidence revealed past ongoing efforts by Mother to identify and provide additional support to J.F. and meet his special needs.

Regarding Father's past conduct, the evidence revealed that Father has not been particularly responsive to the professionals providing support to J.F.

In coming to its custody decision, the court considered all Custody Factors, but weighed 9 and 10 heavily. In considering these two factors, the court again was very cognizant of J.F.'s diagnosis and special needs.

(Trial Ct. Op., at 22-24) (unnecessary capitalization and footnote omitted).

In its summary of its analysis of custody factors, the court observed as to Factor Nine, "[t]he court determined that both Mother and Father are capable of maintaining a loving environment; however, the court determined that Mother is more likely to provide a stable, consistent and nurturing relationship adequate for the Children's emotional needs." (Trial Ct. Op., at Exhibit B, at 1). As to Factor Ten, it found that although "[b]oth parties seemed likely to attend to the daily needs of the Children[,] Mother has been attending to their emotional, developmental, educational and special needs, while Father, although focused on J.F.'s educational needs, has no plan for K.F., is unresponsive to professionals supporting J.F. and is generally unaware of the Children's needs. (*Id.* at 8-9).

We discern no abuse of discretion. The record was replete with testimony and evidence regarding J.F. and his special needs and the court's opinion and summary of its analysis of custody factors demonstrate that the court considered these in making its decision. The court observed that the

testimony revealed that Mother reached out to the school district psychologist when she registered J.F. for school to have IEPs performed, and when the pandemic hit, she arranged for him to receive virtual services and support and for him to safely (masked, outside, socially distanced) meet in-person with his behavior therapist and therapeutic support staff. She maintains regular contact with J.F.'s support team, while professionals had to reach out multiple times before Father would respond to communications.

Ms. Danilo and J.F.'s support professionals reported on his high need for continuity in schedules and routine. Ms. Danilo observed that Mother recognizes and attends to this need for consistency, but that Father seems resistant to this need, even filing for primary custody when he was aware of Ms. Danilo's report that even a 50/50 schedule would cause great harm to J.F.

Therefore, the evidence of record reveals that the court considered J.F.'s special needs in reaching its decision, despite Father's allegation to the contrary.

**2.**

Father argues that the trial court abused its discretion in granting Mother primary physical custody of the Children because this puts them at risk of being infected with Covid-19 since she is a nurse anesthetist. Our review of the record supports the trial court's decision in this regard.

At the outset, this Court is sensitive to the severity of the Covid-19 pandemic and we do not minimize Father's general concerns about it.

However, our review of the record confirms that both parents are equally focused on ensuring that neither they nor the Children are exposed. They both follow CDC guidelines and safety measures and Father failed to provide evidence that the Children are put in any higher risk due to Mother's profession. In fact, Father did not provide any specific evidence or testimony about Mother's job, her job-related duties, her exposure to Covid-19 positive patients, the safety protocols at the hospital or Mother's lack of compliance with them.

The credible evidence was that Mother follows all safety protocols to keep the Children and herself safe from Covid-19, including masks, staying home, sanitizing surfaces and taking every precaution of which she is aware. Mother does not work on a Covid-19 unit, wears full PPE and is provided with new PPE each shift. All patients at the hospital at which she works are screened for Covid-19 and there are protocols should a patient test positive. She took a leave of absence from March 21, 2020, until May 11, 2020, during the initial surge, and at the time of the trial, intended to take a second leave in the fall. Father did not dispute that Mother is following protocols and that he had no reason to be concerned that she was not following them.

Although Father complains that Mother's testimony regarding her Covid-19 exposure was inconsistent, the court did not find it to be so, and our review of the notes of testimony supports this finding. On cross-examination, Mother clearly stated she has not been tested for Covid-19, but that a subgroup of

hospital employees had been tested, with negative results. Mother testified that she has contact with a patient only if he or she is assigned to her. Our independent review confirms the court's finding that Mother's testimony was forthcoming and direct, with nothing inconsistent or evasive about it.

Finally, although Father testified that the Children had experienced mild Covid-19 symptoms, the court found his concerns to be exaggerated and merely a pretext for seeking primary physical custody. As stated previously, J.F. experienced a mild fever for one day that was eradicated by a dose of Tylenol, and K.F. suffered a stomachache and nausea, but there was no proof that either child's symptoms were Covid-19-related where they were neither tested for it nor even taken to the doctor for them.

Based on our independent review of the record, as well as the court's credibility determinations, we conclude that Father's allegation that the court failed to properly consider that Mother works as a nurse anesthetist during a pandemic to be unpersuasive.

**3.**

Father maintains the court erred in failing to consider that he works from home so he can assist the Children with online learning and address J.F.'s special needs, in reducing his partial custody time during the summer and in failing to consider J.F.'s IEP reports to reach its decision.

The record belies Father's claims where it demonstrates that the court considered all these items and, in balancing the custody factors, merely

reached a different conclusion than he would have preferred. The court observed that Father did not present any evidence that decreasing Mother's custodial time would better serve J.F.'s educational needs or behavioral issues. It maintains that it did review J.F.'s IEP reports and did not identify any information in them that showed Mother caused or contributed to J.F.'s negative behavior or regression. (*See* Trial Ct. Op. at 21).

We first note that the court found that Factor Twelve, each party's availability to care for the child, was in Father's favor since he works from home. (*See* N.T. Trial, at 143-44). Therefore, the court did, in fact, consider that Father works from home. However, in balancing the custody factors and the evidence provided, the court concluded that primary physical custody with Mother was in the Children's best interest.

The trial court noted that Father's historical actions belie what he would do with the Children in the future. We agree. For example, when the Children are with him, he does not encourage them to do their homework, instead putting if off until they return to Mother and, as noted previously, he has been either slow to respond or non-responsive with the paraprofessionals providing J.F. with support. In fact, he admitted that he did not schedule individual meetings with J.F.'s teachers to address his concerns outside of the two IEP meetings. Mother was available to assist J.F. with his online learning in the spring of 2020 and he met the standards in all academic areas, and Father agreed that she has the same ability to help J.F. academically as he does.

Additionally, although the trial court did reduce Father's extended summer visitation schedule, his overall time increased. We discern no abuse of discretion where this provided J.F. with a consistent yearly schedule since Mother, Father and Ms. Danilo all agreed that consistency is in J.F.'s best interest. Further, Ms. Danilo noted that increasing Father's time would result in an attention imbalance where K.F. feels she is secondary to J.F. in Father's eyes.

Finally, we observe that Father's claim regarding the trial court's alleged failure to consider the IEP report and report cards is unsupported. The trial court order and opinion are replete with examples of where the court considered this evidence and its rationale for proceeding the way that it did. Our independent review of the IEP reports and J.F.'s report cards confirms that while both parents attended the IEP meetings, Mother also would email the team with concerns and suggestions, J.F.'s report card did not evidence any sustained academic decline, and the reports of his professional service providers provided to Ms. Danilo reflected improvement at school.

In summary, we agree with the court's conclusion that:

> Father's appeal is not based on any evidentiary ruling, nor has Father cited to any legal authority with which he claims the court failed to comply. Rather, Father disagrees with the court's findings of fact, its credibility determinations, and the relative weight it gave to certain of the 16 Custody Factors. In some instances, Father claims that the court did not consider certain facts or evidence, but in all instances, the record reveals otherwise.

(Trial Ct. Op., at 26).

We discern no abuse of discretion by the trial court where the competent evidence of record supports its custody decision.  **See C.R.F.**, **supra** at 443. Father's issues do not merit relief.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/4/21