J-A04004-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: P.M., IV., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1448 MDA 2022 |

Appeal from the Decree Entered September 14, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0002a

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

DISSENTING MEMORANDUM BY DUBOW, J.:          **FILED MAY 25, 2023**

I respectfully dissent from the Majority's decision to reverse the trial court's conclusion that Paternal Aunt presented clear and convincing evidence to involuntarily terminate Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1).

Our well settled standard of review dictates that we defer to the factual findings and credibility determinations of the trial court if they are supported by the record and bars this Court from reversing a decision simply because the record would support a different result.  ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

Here, upon review, the record supports the trial court's factual findings and credibility determinations.  Although the majority highlights evidence that could support a different result, it is not this Court's job to reweigh the evidence or generate our own findings of fact.  On the contrary, we are

constrained to show "deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *Id.* As explained below, because I believe the majority is misapplying our required standard of review, I respectfully dissent and would affirm the trial court's decision to terminate Mother's parental rights to child.

**A.**

In its Opinion in Support of Order Granting Petition for Involuntary Termination of Parental Rights issued contemporaneously with its termination decree, the trial court set forth the following findings of fact:

> [Child] was born in August of 2017 to [Mother] and [Father]. Father instituted a custody action against Mother in August of 2020 relating only to Child. In September of 2020, [Paternal Aunt] petitioned to intervene in the custody action, claiming she had had sole physical custody of Child since July of 2019. Presumably based upon [Paternal Aunt]'s intervention, Mother and Father agreed to withdraw the first custody complaint. Shortly thereafter, [Paternal Aunt] brought her own custody action against both Mother and Father on the same grounds as her intervention. Prior to the conciliation of this custody action, the Court awarded temporary physical custody of Child to [Paternal Aunt].
>
> After the parties failed to reach an agreement at conciliation, the Court entered an interim custody order dated October 22, 2020, which awarded legal custody of Child to [Paternal Aunt] and primary physical custody to [Paternal Aunt]. Mother and Father were each awarded partial physical custody in the form of supervised visitation. After a full custody trial, the Court entered its final order for custody on March 5, 2021. This order mostly affirmed the interim order, with minor changes. Mother and Father's supervised visitations were limited to one time per week, whether together or separate. The final order also made clear its finding that both Mother and Father are a risk of harm to Child.

On November 10, 2021[,] [Paternal Aunt] sought special relief in the form of suspending Mother's visits with Child. On November 16, 2021, at a session of family current business court, the Court temporar[il]y suspended Mother's visits and schedul[ed] a hearing for January 13, 2022. . . . At the conclusion of the February 10, 2022 hearing, the Court suspended Mother's visits complete[ly] and ordered that only therapeutic visits supervised by Child's therapist would be permitted. No appeal was taken to any of the custody orders entered.

The previous findings stem from the Court's taking of judicial notice of the custody action, docketed at 2020-FC-002305-03. N.T.[, 5/12/22, at 4-5]. While the above facts took place more than 6 months prior to [Paternal Aunt] filing her Petition for Involuntary Termination of Parental Rights, they are fundamental to an understanding of the facts which occurred inside the 6-month timeframe.

On January 11, 2022, [Paternal Aunt] filed her Petition for Involuntary Termination of Parental Rights under Section 2511(a)(1). . . . [Paternal Aunt]'s case with respect to Mother was continued to May 20, 2022. During that just under two[-]hour portion of the trial, the Court heard from one of Mother's witnesses, the Child's therapist, as well as [Paternal Aunt]. [Child's therapist] testified Child was experiencing very negative play therapy and episodes of soiling after visitations with Mother. She further testified, "[Child is] progressing in his therapy since the visits have been paused." N.T.[, 5/20/22, at 11]. Additionally, she opined if the visits between Mother and Child were to resume, Child "would have aggression. I believe that he would return to noncompliance, soiling, difficult days, dinginess, nightmares, and I do think it would re-trigger trauma." *Id.* at 15[].

[Paternal Aunt] testified next, with the importance of her testimony being the frequency of Mother's visits and phone calls with Child. Within the time period relevant to our review, which is between July 11, 2021 and January 11, 2022, Mother had 6 visits with Child in person. Mother also conducted 13 FaceTime calls with Child. Based upon the custody orders then in effect, Mother could have [had] 18 in person visits with Child and 36 FaceTime calls. However, 4 in persons visits were cancelled in September due to Mother's exposure to COVID-19. N.T.[, 5/20/22, at 61]. Also of note, Mother did purchase a birthday gift or gifts for Child. *Id.* at 57[]. However, in communication between Mother and [Paternal Aunt] before Child's birthday,

Mother stated, "I don't know the child, so I need some ideas on how to buy him a present for his birthday." *Id.* at 57[].

Mother also testified on July 22, 2022. While Mother testified, the Court found Mother's testimony incredible and self-serving. Most of her testimony focused on blaming others for her lack of contact with Child. The remainder of the testimony was either outside the six-months period this Court is to examine or an attempt to re-litigate the final custody orders that had been entered. However, of somewhat greater importance, Mother admitted that after being found to be a risk of harm to Child, she took no action to address that finding. N.T.[, 7/22/22, at 69-70].

Trial Ct. Op., 9/14/22, at 1-4. Based on these findings, the trial court concluded that Mother failed to perform affirmative parental duties for a period of more than six months and that termination of parental rights would be in Child's best interest.

On appeal, Mother raises numerous allegations of error, including that the trial court abused its discretion when it terminated Mother's parental rights pursuant to Sections 2511(a)(1) and (b).[1] Mother's Br. at 5.

**B.**

In addressing Mother's issues, we are mindful of our well settled standard of review. As discussed above, when we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d at 267. "If the

---

[1] Mother also claims that the trial court failed to properly consider Paternal Aunt's "gamesmanship" and the obstacles Mother faced, refused to permit Father to testify on behalf of Mother, and refused to hear testimony establishing the whole history of the case. In its Rule 1925(a) Opinion, the trial court adequately addressed these issues, and I decline to address them here. *See* Trial Ct. Op., 10/19/22, at 1-5.

factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

Section 2511 of the Adoption Act governs termination of parental rights and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). "[I]f the court determines that the parent's conduct warrants termination of his or her parental rights," the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted).

**C.**

Mother first challenges the trial court's termination of her parental rights pursuant to Section 2511(a)(1). The trial court concluded that Mother failed to perform parental duties as demonstrated by her by failure to attend all available video and in-person visits with Child, reach out in a timely and assertive fashion to child's therapist for updates, and request a modification of the custody order. Trial Ct. Op., 9/14/22, at 7-10. In analyzing the post-abandonment contact between Mother and Child, the trial court found:

- 5 -

We are also concerned with the way Mother proports her efforts as "all she could do given the Custody Order." Of the 36 permitted Facetime calls under the Order, Mother performed 13. Even if viewed in light of Mother's claim that half of those calls were set aside for [] Father, that still left 18 for Mother. We are unpersuaded that Mother exerted herself with every means possible to have regular contact with Child when she missed 5 calls and could call twice each week, regardless of any outside circumstances. Similarly, Mother was permitted 14 physical visits with Child under the Order. However, between July 2021 and January 2022, Mother performed less than half, visiting only 6 times. Even with the suspension of supervised visits under the November 16, 2021 Order pending a hearing, Mother was still permitted one visit per week prior to the suspension, a period of 18 full weeks. Again, these numbers lend themselves towards more of a passive interest in the development of Child and a failure to take all available avenues for performing parental duties.

Trial Ct. Op., 9/14/22, at 8-9.

The trial court placed little weight on Mother's argument that the Custody Order in place prevented her from making more of an effort to perform parental duties, explaining:

[B]y her own admission and understanding [the Custody Order] strips her of legal **custody**, not contact. . . . Performing parental duties do not require custody. Custody orders and extraneous circumstances, such as incarceration [], do not prohibit a parent from exerting themselves and taking active steps know their child or to take every advantage of every means possible to know about the health and well-being of their child, too. And, ignorance of law or one's understanding of potential legal avenues to pursue is not a valid excuse. *See In re B.,N.M*., [856 A.2d 847, 856-57 (Pa. Super. 2004)] (where the court granted petition for involuntary termination of parental rights of an incarcerated father who consistently pointed to external circumstances keeping him from performing parental duties but also sat idle for months at a time without attempting to take any legal action).

*Id.* at 9.

The trial court also emphasized Mother's passive interest in Child's physical and mental well-being as evidenced by her failure to reach out to Child's therapist. The trial court found:

> Child's therapist had been treating him since October 30, 2020[,] and held more than 50 sessions with Child in that time. And with all of that, Mother still did not avail herself of one of the most important ways to re-engage with her son – reaching out for updates on Child's sessions or for ways she could better support and connect with him. Mother testified that she did not reach out to the therapist during that time because "it wasn't something that seemed to be a concern at the time." N.T.[, 7/22/22, at 61]. Despite her belief, this was clear inaction on her part. She never once reached out [to the therapist] for updates. Such decisions display a passive interest in the development of Child, not a desire to exert herself within the relationship.

Trial Ct. Op. at 7-8.

Finally, in considering Mother's efforts to re-establish contact with Child, the court placed great weight on the fact that Mother failed to pursue any legal action to change her custody orders or dispute the custody court's finding that she was a risk of harm to Child. *Id.* at 9-10.

Upon review, I believe that the record supports the trial court's findings. I decline to reweigh the evidence or interfere with the court's credibility determinations and, therefore, would find no abuse of discretion in the trial court's conclusion that Paternal Aunt presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a)(1).

**D.**

As discussed below, in reversing the trial court's decision, the Majority reweighs the evidence, usurps credibility determinations, and creates factual

findings. In its decision, the Majority agrees with Mother's claims that she performed parental duties to the best of her ability when she: (1) exercised as much visitation as allowed by the custody order, (2) maintained consistent email contact with Paternal Aunt, and (3) contacted Paternal Aunt one time to request a meeting with Child's therapist – despite the trial court's findings to the contrary. Majority Memo. at 15-16.

Further, the Majority acknowledges that the trial court did not find Mother to be credible, but nevertheless credits Mother's testimony that Paternal Aunt created obstacles and barriers to Mother's contact with Child when Paternal Aunt enforced strict rules surrounding visitation. *Id.* at 16-17. The Majority finds, "Paternal Aunt and Paternal Grandmother generated extrajudicial obstacles which impeded Mother from exercising additional calls and visits." *Id.* at 16. This is a finding for the trial court to make in the first instance, and directly conflicts with the trial court's finding that Mother's "passive interest" in Child prevented additional visitation. Trial Ct. Op., 9/14/22, at 8-9.

Rather than concluding that Paternal Aunt created barriers for Mother, the trial court found, "Mother has tended to blame others, particularly [Paternal Aunt] and the courts, for her inability to perform specific parental duties." Trial Ct. Op. at 11. Notably, the trial court declined to find that Mother faced barriers that justified her failure to take legal action. *Id.*

Moreover, the Majority ignores the trial court's credibility determinations and not only credits, but also emphasizes Mother's testimony that she was

focusing on her sobriety, was making progress, and "didn't feel like [she] had enough to stand on in court yet in order to modify anything." Majority Memo. at 19 (citing N.T., 7/22/22, at 126). Additionally, the Majority places greater weight on the fact that Mother appeared in court to defend her custodial rights to Child, rather than deferring to the trial court's findings that Mother failed to initiate any legal proceedings to increase her visitation schedule. ***See id.***

Finally, the Majority cites ***L.A.K.,*** 265 A.3d 580 (Pa. 2021), to support their overall disposition, and the proposition that Mother was overcoming obstacles when she was working towards obtaining sobriety and maintaining stability before she pursued additional visitation with Child. Majority Memo. at 19-20. ***L.A.K.*** is easily distinguished from the instant case and, therefore, unpersuasive.

In ***L.A.K.***, a father struggled with alcoholism, made repeated attempts at obtaining sobriety, and did not contact his children during that time out of concern for their best interests. ***Id.*** at 599. The trial court **credited Father's testimony** and found that father acted with reasonable firmness in overcoming obstacles that kept him from performing parental duties and denied the termination petition. ***Id.*** This Court reversed and, on appeal, our Supreme Court concluded that because the record supported the trial court's findings and it was in the trial court's discretion to make credibility determinations and weigh the evidence, that the trial court did not abuse its discretion. ***Id.*** Our Supreme Court concluded that this Court erred in ruling to the contrary***. Id.***

The key difference between **L.A.K.** and the instant case is that here **the trial court did not find Mother's testimony to be credible**. To the contrary, the trial court found Mother's testimony to be "incredible and self-serving." Trial Ct. Op., 9/14/22, at 4. Accordingly, in my view, **L.A.K.** instructs this Court to defer to the trial court when, as here, the record supports the trial court's findings.

The Majority's findings reweigh the evidence and usurp the trial court's credibility determinations in contravention of our standard of review. As stated above, although the majority highlights evidence that could support a different result, it is not this Court's job to reweigh the evidence or generate our own findings of fact. On the contrary, we are constrained to show deference to the trial court when the findings are supported by the record, even in cases where the evidence could support two different results. Accordingly, I respectfully dissent.

**E.**

Mother also argues that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(b). With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and

welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its "termination would destroy an existing, necessary, and beneficial relationship." *Id.* at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Mother avers that the trial court should have credited her testimony that visits between her and Child were playful, happy, comforting and positive over the testimony from the Child's play therapist that Child did not have a bond with Mother. Mother's Br. at 64. Mother argues that the Child's therapist never witnessed a visit and did not have first-hand knowledge of Child's relationship with Mother. *Id*. at 65-66.

Instantly, the trial court credited Child's therapist's testimony that visits with Mother were stressful for Child and that Child was not bonded to Mother. The trial court opined:

> Mother is quick to highlight her perception of Child's "happiness and comfort" level when interacting with her during supervised visits, stating that Child would warm up to her in time and sometimes enjoyed sitting with her, holding her hand, or laying his head on her shoulder. Mother's Exhibits 28A-E, and 24. However, Child's therapist, who again worked with him for a significant amount of time, testified that visits were actually very stressful on [C]hild and not beneficial to him. And, the therapist again contradicted Mother's testimony, stating that from his professional viewpoint, there was not a bond between Mother and Child. N.T.,[5/20/22, at 38]. Additionally, further testimony by the therapist indicates Child was actually progressing in therapy since visits with Mother were suspended in November 2021. These facts alone, unfortunately, indicate that the termination of parental rights here would not destroy an existing beneficial relationship or bond.

Trial Ct. Op, 9/14/22, at 11-12. Upon review, I believe that the record supports the trial court's findings.

**F.**

In conclusion, because the record supports the trial court's findings, I would affirm the court's decision to terminate Mother's parental rights pursuant to Sections 2511(a)(1) and (b). Accordingly, I respectfully dissent.