2018 PA Super 277

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.N.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 162 WDA 2018 |

Appeal from the Order January 17, 2018
In the Court of Common Pleas of Fayette County
Orphans' Court at No. 68-Adopt-2016

BEFORE:   BOWES, J., STABILE, J., and STRASSBURGER, J.*

OPINION BY STABILE, J.:                               FILED OCTOBER 11, 2018

A.M. ("Mother") appeals from the January 17, 2018 order in the Court of Common Pleas of Fayette County denying her petition for the involuntary termination of parental rights of J.R.H. ("Father") to the female child, N.N.H., born in June of 2005, pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).  Upon careful review, we affirm.

The record evidence supports the following facts and procedural history set forth by the orphans' court in its opinion accompanying the subject order.

> Mother . . . and Father were involved in a relationship for approximately thirteen years.  During this relationship, N.N.H. . . . . was born and the family lived together until she was six years of age.  In 2011, when N.N.H. was six years old, Father commenced a federal prison sentence.[1]  He was released from prison on May 25, 2016.

_____

[1] Father testified that he was incarcerated for crimes relating to illegal drugs. N.T., 1/31/17, at 80.

_____

*   Retired Senior Judge assigned to the Superior Court.

For the first two years, Mother brought N.N.H. to see her Father in prison on a regular basis.  Father was moved to another prison in the state of New Jersey in 2013.  The last visit was December 21, 2013 when Mother stopped bringing N.N.H. to see her Father.

Father continuously wrote to N.N.H. and sent her handmade crafts.  N.N.H. reciprocated by sending cards and letters.  These endearing cards spoke of her love, and conveyed kisses and reassurance that she would always remember him.

Mother filed for sole legal and physical custody of N.N.H.  By Order dated March 17, 2015,[2] th[e] [c]ourt granted custody to Mother.[3]  Father was not present to contest.  Mother continued to permit Father to call his daughter once or twice a week from January [of] 2014 until November of 2015.  At that time, N.N.H. was ten years old and had enjoyed regular contact with her Father by phone and through such correspondence.

In December of 2015, Mother changed the telephone number and did not provide it to Father.  Father sought to find the number through family members and succeeded.  Mother changed the number a second time.  Father was totally precluded by Mother from calling N.N.H.

By February 2016, Father testified that all letters he had written to N.N.H. were returned.  Father patiently waited for his release coming soon from prison, knowing that he would attempt to repair the custody situation when he was more able to get involved in the process.

---

[2] This is an interim custody order dated March 16, 2015, which Mother introduced as an exhibit during the involuntary termination proceeding, and the court admitted as Exhibit 1.

[3] The Honorable Nancy D. Vernon presided over the underlying custody matter, and she presided over the involuntary termination proceeding.  See N.T., 1/31/18, at Exhibit A.

Father was released from prison on May 25, 2016. Almost immediately, Father contacted an attorney to seek partial custody rights and a [p]etition was so filed on June 14, 2016. . . .

Not until the child was twelve years old and Father filed for partial custody had Mother ever challenged paternity. Mother then filed for DNA paternity testing on August 9, 2016.[4] The Order granting relief was entered on August 16, 2016. This testing stayed the custody proceedings until the results were determined on October 21, 2016. The child that Father had attended to since birth, [with] whose [m]other he had a relationship for thirteen years and actively encouraged his involvement in the child's life for a decade, was indeed found to be his child.

Facing a resolution of Father's pending [c]ustody [p]etition, Mother file[d] an [e]mergency [p]etition to [s]tay [c]ustody [p]roceedings which was signed by the [c]ourt on December 9, 2016. The reason for staying the proceedings was because Mother intended to file a [p]etition to [t]erminate [Father's parental] rights[,] which she did on December 14, 2016.

From March 17, 2015, the Order granting Mother sole custody has continued to be in effect. Mother admittedly has denied Father all contact to N.N.H. It appears to the [c]ourt that Mother has been systematically eliminating Father from N.N.H.'s life. The entire

_____

[4] The custody docket, which Father introduced during the involuntary termination proceeding, and the court admitted as Exhibit A, shows that a petition for DNA testing was filed on August 9, 2016. It does not show who filed it. During cross-examination by the Guardian Ad Litem ("GAL"), Mother testified that she did not contest Father's paternity or request the DNA test, but that either the custody mediator or Father requested it. See N.T., 1/31/18, at 37-38. We note that the March 16, 2015 interim custody order, supra, stated generally that Father "has not filed a paternity acknowledgment and thus has not demonstrated standing, and paternity must be pled pursuant to Pa.R.C.P. 1915.3(d) and 23 Pa.C.S. § 5103 before any claim by [Father] will be heard by the [c]ourt." Order, 3/16/15. Therefore, the record does not clearly support the court's finding that Mother requested Father's DNA testing, but that the mediator may have required it.

history of this case was provided to the [c]ourt during the termination proceeding on January 31, 2017.[5]

Subsequent to the hearing, the parties were given and granted extensions of time to file [b]riefs upon receipt of the transcript. Additionally, during the pendency of this decision, the Supreme Court of Pennsylvania by virtue of . . . [In re Adoption of L.B.M., 161 A.3d 172, 174 (Pa. 2017)], shed light on the duty of the [c]ourt to appoint a legal representative for the child in addition to the Guardian Ad Litem if there exists a conflict with the child's legal interests and best interests analysis. Upon ascertaining that indeed such conflict existed, [the] [c]ourt reopened the case for further hearing and appointed an attorney to represent the child's interests. No additional testimony was produced and legal counsel for the child additionally filed a [b]rief on behalf of N.N.H.

Trial Court Opinion, 1/17/18, at 1-3.

By order dated January 17, 2018, the orphans' court denied Mother's petition. Mother timely filed a notice of appeal on January 25, 2018. By order dated January 29, 2018, the orphans' court directed Mother to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) within 21 days, and she timely complied.[6]

_____

[5] During the termination proceeding, Mother testified on her own behalf, and she presented the testimony of her husband, M.M. ("Stepfather"), who stated that he is willing and "prepared to adopt" N.N.H. N.T., 1/31/17, at 45. Father testified on his own behalf, and he presented the testimony of his sister, D.J.H.-J. N.N.H., who was represented during the hearing by a GAL, testified in camera to questions posed by the parties' counsel, the GAL, and the orphans' court.

[6] Mother's notice of appeal was defective because she failed to file her concise statement of errors complained of on appeal contemporaneously as required by Pa.R.A.P. 1925(a)(2)(i). See In re K.T.E.L., 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a concise statement of errors complained of on appeal with the notice of appeal will result in a defective

Before addressing the merits of this appeal, we must determine whether N.N.H. had the benefit of counsel during the involuntary termination proceeding as required by Section 2313(a) of the Adoption Act. Pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for child's legal interests, which our Supreme Court has defined as a child's preferred outcome.[7] In re T.S., __ A.3d __, 2018 WL 4001825 at * 1 (Pa. 2018) (citing In re Adoption of L.B.M., 161 A.3d 172, 174 (Pa. 2017)). Because the right to counsel belongs to the child who is unable to address a deprivation of his or her right to counsel on his or her own behalf, we must address this issue sua sponte. In re K.J.H., 180 A.3d 411 (Pa.

_____

notice of appeal, to be disposed of on a case by case basis). However, Mother timely complied with the orphans' court's order to file the concise statement. In addition, no party has claimed that they were prejudiced as a result of Mother's procedural misstep, and we are unaware of any prejudice. Therefore, we conclude that Mother's error was harmless. Cf. J.P. v. S.P., 991 A.2d 904 (Pa. Super. 2010) (appellant waived all issues by failing to timely comply with the trial court's direct order to file a concise statement).

[7] Section 2313(a) provides:

> (a) Child.--The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

Super. 2018) (holding that this Court must determine sua sponte whether 23 Pa.C.S.A. § 2313(a) was satisfied).

In this case, N.N.H., then twelve years old and in sixth grade, was represented by a GAL who argued for the denial of the involuntary termination petition pursuant to Section 2511(a)(1). However, N.N.H. testified at length on inquiry by the parties' counsel, the GAL, and the orphans' court that she was afraid of Father and did not wish to see him again. See N.T., 1/31/17, at 88-115. She specifically testified that she preferred for the orphans' court to terminate his parental rights. See id. at 110.

Recognizing that N.N.H.'s legal interests were not represented during the proceedings, on July 12, 2017, prior to ruling on Mother's petition, the orphans' court appointed Patrick McDaniel, Esquire, to represent the legal interests of N.N.H. The order stated, in part:

> Anthony Dedola, Esquire[,] shall remain as the Guardian Ad Litem. Attorney McDaniel will be provided a copy of the prior proceeding and all briefs of the parties.
>
> IT IS FURTHER ORDERED and DECREED that the Court reconvenes the hearing in this matter on Thursday, July 20, 2017 . . . for the purpose of additional testimony, if necessary, to be requested or presented by Attorney McDaniel.

Order, 7/12/17. The orphans' court amended this order on July 17, 2017, by releasing Attorney McDaniel from his representation and appointing Jennifer Casini, Esquire, to represent the legal interests of N.N.H. See Order, 7/17/17. The court again reconvened the matter for the same purpose on July 20, 2017. Id. Thereafter, the orphans' court issued the following order:

> AND NOW, this 20th day of July, 2017, the Court reconvening for purposes of taking additional testimony, if necessary, presented by the legal representative of the child, Attorney Jennifer Casini, and Attorney Jennifer Casini indicating that she does not desire to call additional witnesses but will rest upon the record in representing her client, Attorney Casini is granted fourteen (14) days in order to submit a brief in regard to the legal position of the child.[8]

Order, 7/20/2017.

Based on the foregoing facts and applicable law, we conclude that N.N.H. was not denied counsel pursuant to Section 2313(a) because the court appointed legal-interests counsel prior to ruling on the termination petition, and the court re-opened the record for any additional testimony deemed necessary by that counsel. Further, N.N.H. clearly articulated her preferred outcome during the termination proceeding and was subject to scrutiny by all counsel and the orphans' court. However, the orphans' court determined that Mother, who had the benefit of counsel during the proceeding, did not meet her burden of proof under Section 2511(a)(1). Therefore, the court denied the petition. Finally, it is important to note that Attorney Casini submitted a brief to this Court advocating for N.N.H.'s legal interests. See In re Adoption of T.M.L.M., 184 A.3d 585, 590 (Pa. Super. 2018) ("Counsel's duty to

---

[8] There is no brief submitted to the orphans' court by Attorney Casini in the certified record. Attorney Casini did file a brief to this Court in which she requests that we reverse the subject order and remand for the orphans' court to terminate Father's parental rights.

represent a child does not stop at the conclusion of the termination of parental rights hearing.") (citations omitted).

We now turn to the issues presented by Mother on appeal, set forth verbatim from her statement of questions involved in her brief:

I.  The trial court erred by failing to terminate [F]ather's rights based on the evidence presented at the hearing in this matter.

II.  Trial court erred in finding that [F]ather overcame the obstacles of incarceration by maintaining sufficient contact with the child in this case.

III.  Trial court erred in finding that [M]other prohibited [F]ather from maintaining meaningful contact with the child.

IV.  The trial court erred by failing to serve the best interests of the child and her health, safety, and welfare[.]

V.  The trial court erred by failing to weigh the opinion of the [GAL] for the child in this case, contradicting her findings as to the best interests of the health[,] safety[,] and welfare of the child.

Mother's Brief at 5.

We are guided by the following standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Section 2511(a)(1) and (b) provide as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

. . .

23 Pa.C.S.A. § 2511(a)(1), (b).

As discussed, the court in this case found that Mother did not prove by clear and convincing evidence that Father's conduct warranted termination under Section 2511(a)(1). Therefore, based on the statutory bifurcated analysis, the court need not engage in analysis under Section 2511(b).

This Court has explained,

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. The court should consider the entire background of the case and not simply:

. . . mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

In re A.S., 11 A.3d 473, 482 (Pa. Super. 2010) (citations omitted).

Our Supreme Court has stated,

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between

parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

In re Adoption of Charles E.D.M., 708 A.2d 88, 92 (Pa. 1998).

Regarding the definition of "parental duties," we have stated,

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

In re B.,N.M., 856 A.2d 847, 855 (Pa. Super. 2004), appeal denied, 872 A.2d 1200 (Pa. 2005) (internal citations omitted).

In In re Adoption of S.P., 47 A.3d 817 (Pa. 2012), our Supreme Court considered the performance of parental duties by incarcerated parents. The

Court discussed In re Adoption of McCray, 331 A.2d 652 (Pa. 1975), a case which pre-dated the codification of Section 2511(a)(1). The Court explained:

> Applying in McCray the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." Id. at 655. We observed that the father's incarceration made his performance of this duty "more difficult." Id.
>
> . . .
>
> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [McCray] at 655 (footnotes and internal quotation marks omitted). . . .

In re Adoption of S.P., 47 A.3d 828.

Instantly, Mother's issues overlap, and she fails to divide the argument section of her brief into separate parts in violation of Rule 2119(a). See Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued. . . ."). We review her claims together.

Mother argues that the orphans' court erred in concluding that she did not meet her burden of proof under Section 2511(a)(1). Mother acknowledges that she obstructed Father's contact with N.N.H. by changing her cell phone number, but asserts that she "did so because she was being threatened with

- 12 -

further physical harm [by Father]. Mother knew the child was greatly distressed by this threat as the child had actually witnessed physical beatings perpetrated by Father in the past[.]" Mother's Brief at 20. Mother also contends that the court erred in failing to consider the best interests of N.N.H. by denying her petition to involuntarily terminate Father's parental rights.

In its opinion accompanying the subject order, the orphans' court made the following findings, which the documentary and testimonial evidence supports.

> In 2011 to 2012, Mother wrote to Father nearly every day and visited regularly. In 2012, Father was moved to Bradford in McKean County[9] which is four hours from Mother's home. A picture of a family visit shows a happy couple and child in 2013. There were Father's Day and Thanksgiving cards. N.N.H.'s Christmas card states, "I love you so much. I'll never forget you." Father sent paintings, handmade crafts and letters. Father's sister . . . used to also call and speak to N.N.H. Father has not been permitted even a supervised visit by Mother since he filed for partial custody in June of 2016.
>
> Father's sister . . . testified that she visited twice with N.N.H. while Father was incarcerated at Bradford. [Father's sister] would receive letters from her brother inquiring about N.N.H. [Father's sister] heard of N.N.H.'s graduation from sixth grade and attended. She was stopped from giving [N.N.H.] cards and letters. In 2014 and 2015, [Father's sister] brought N.N.H. to her home for holidays.
>
> Father testified that the last card he received from N.N.H. was at Christmas of 2015. He maintained contact with Mother's sister and brother. They remain close friends. Father's last call to his daughter was November 20, 2015. He was unable to call

_____

[9] We presume Father was transferred to Federal Correctional Institution McKean, in McKean County, Pennsylvania.

thereafter. His mail came back in January of 2016 as well as a Valentine card in February of 2016.

Father produced a thick folder of every letter N.N.H. had written and every picture she had sent. The [c]ourt notes the folder was approximately 1½ inches wide and filled. Mother wrote on the backs of the picture[s] if it was dance, softball or friends and the date. In 2015, it all changed when Father testified Mother told him that she was having an affair with a married man and was in love with him.[10]

Trial Court Opinion, 1/17/18, at 7-8 (citations to record omitted).

With respect to the change in their relationship, the court made the following findings:

Mother . . . acknowledged that Father has written and sent cards as well as called her daughter until she stopped the bi-weekly calls by changing her number.

Both Mother and child testified that Father threatened Mother through a phone call with N.N.H. allegedly telling the child that Mother will be hurt, but N.N.H. will be O.K. This is, of course, alarming to the [c]ourt and also a justification for Mother to wish Father out of her life. However, to terminate Father's parental rights[,] because of an apparent threat to Mother, is a drastic step which eliminates the parent and the family to N.N.H. There is no evidence that Father does not love his daughter. There is ample evidence that for years the parties were together and N.N.H. had an emotional bond with her Father. Although Mother had a rocky and what she classified as an abusive relationship with Father, yet she did continue to associate with Father's family and take N.N.H. to visit her Father in prison. The child has actively known her Father for the vast majority of her life.

_____

[10] This man is Stepfather, whom the court found Mother married "the week before the [termination] hearing. Together the couple has two children, . . . ages [approximately fifteen months] and three [months]. [Mother] also [has] a nineteen-year-old stepson . . . living in the household." Trial Court Opinion, 1/17/18, at 5; N.T., 1/31/17, at 8-9, 70.

Id. at 6 (citations to record omitted).

The testimony of N.N.H., Mother, and Stepfather reveals that, in approximately November 2015, Father threatened Mother during a speakerphone conversation between him and N.N.H. N.N.H. related the conversation on inquiry by Mother's counsel:

Q. Tell us about that.

A. It was before we lived with my stepdad, and we were at my, like, house before this house with my stepdad, and it was, like, nighttime, it was dark outside, and I guess he called us and he was, like, I'm going to have my sister come and beat you up but he told me that everything was going to be okay.

Q. Told you?

A. Yeah. He said that everything was going to be okay for me but that my mom was going to get beat up.

Q. Was that the last time you talked to him on the telephone?

A. It was one of the last.

N.T., 1/31/17, at 100-101. Mother and Stepfather testified that Mother changed her cell phone number because of this conversation, and Mother testified she did not give Father her new cell phone number. Id. at 15-16, 33, 47. In addition, Stepfather testified that he overheard the foregoing phone conversation, and that Mother and N.N.H. moved in to his home as a result of Father's threat. Id. at 47.

Father testified that he was transferred to the federal prison in Fairton, New Jersey, in March of 2014, and he was released in May of 2016. Id. at 63. Neither N.N.H. nor Mother ever visited him at that prison. Id. However,

he remained in contact with N.N.H. by telephone. Father explained that Mother only had a cell phone, on which he would talk to N.N.H., who used the speakerphone. Id. at 65. Father testified that he called two to three times a week until N.N.H. began school in the fall of 2015, when Mother limited his calls to Thursday evenings at 7:00 p.m. Id. Father testified that his last phone call with N.N.H. was four or five days before Thanksgiving in 2015. Id. at 66. He explained that Mother never answered her cell phone after that, but Mother's brother gave him her new cell phone number in December of 2015. Id. Father called the new cell phone number, and Mother answered, was upset that he obtained the phone number, and then she promptly hung up. Id. Father was never able to reach N.N.H. by telephone again. Id.

Father testified that the last mail he received from N.N.H. was a Christmas card in 2015, and it included the return address of Mother's new home. Id. at 68, 75. He explained that Mother had resided in his house until the fall of 2015, when she sold it. Id. at 67. Father testified that, in January of 2016, he sent N.N.H. mail to the new address, but it was returned to him in prison. Id. at 67-68. Nevertheless, Father stated that he sent cards to N.N.H. for every holiday, and he sent her "missing you cards," all of which were returned to the prison. Id. at 76, 78.

Two weeks after his release from prison on May 25, 2016, Father filed a petition for modification of the existing custody order. Id. at 70, 86. Father testified that the matter was continued many times, and, in October of 2016,

his request to visit with N.N.H. was denied by a mediator. Id. at 70-71. In addition, Father testified that, after his release from prison, he again attempted to obtain Mother's new cell phone number from her family, but they would not give it to him. Id. at 72.

The orphans' court made credibility determinations in favor of Father and against Mother insofar as she denied changing her cell phone number a second time and denied that she returned Father's mail to the prison, which we may not disturb. See In re T.S.M., supra.

Based on the documentary and testimonial evidence, the court concluded, in effect, that Mother unilaterally decided it was not in N.N.H.'s best interests to communicate with or to see Father. Mother justifies her action based on the threat Father made against Mother in the November 2015 phone call. She decided to seek approval by the court through termination rather than custody proceedings. The orphans' court concluded that Father's threat "is alarming," but that terminating his parental rights in this case "is a drastic step." Trial Court Opinion, 1/17/18, at 6. Indeed, the court concluded that Mother did not prove, in light of the totality of the circumstances, that Father's conduct clearly warranted termination under Section 2511(a)(1). The court reasoned:

> Th[e] [c]ourt finds that Mother's claim that Father failed to perform parental duties within six months of the filing must fail. The [p]etition for [i]nvoluntary [t]ermination of [p]arental [r]ights was filed on December 14, 2016. The six[-] month look back period would be June 14, 2016. Father was released from prison May 25, 2016. He hired an attorney and the attorney filed for

[m]odification of the [c]ustody [o]rder to enable Father to see his child on June 14, 2016. Thereafter, through family and friends, he attempted to make contact. Mother testified she precluded all contact with the child and has eliminated Father's family as well. Father was anxious for a custody resolution but was stalled at each scheduled custody conference by a continuance granted by the [c]ourt for DNA results and the termination petition. It is through no lack of effort on behalf of Father that he has failed to make contact or perform parental duties. He has been thwarted by Mother directly, or through [c]ourt [o]rders. Th[e] [c]ourt finds that Father for the six months prior to the filing of the [i]nvoluntary [p]etition for [t]ermination actively tried everything in his power to see N.N.H. and perform parental duties.

Trial Court Opinion, 1/17/18, at 5 (citations to record omitted). Based on our review of the record and the applicable statutory and case law, we discern no abuse of discretion.

Mother dedicates much of the argument section of her brief to the contention that the order denying her termination petition does not serve the best interests of N.N.H. pursuant to Section 2511(b) because the child expressed fear of Father and happiness with Stepfather. Mother's contention fails because the court denied her petition under Section 2511(a)(1); therefore, an analysis of N.N.H.'s best interests under Section 2511(b) is not relevant or warranted pursuant to the requisite bifurcated analysis. See In re L.M., supra. Accordingly, we affirm the order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2018