J-A29039-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: H.S.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.R., MOTHER | : : : : : : : | |
| | : | No. 864 WDA 2024 |

Appeal from the Decree Entered June 27, 2024
In the Court of Common Pleas of Fayette County
Orphans' Court at 22-ADOPT-2024

BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: February 20, 2025**

A.R. (Mother) appeals from the decree which terminated her parental rights to H.S.M. (Child).[1]  Upon review, we affirm.

*Case History*

Child is approximately 2½ years old.  The Fayette County Office of Children and Youth Services (CYS) obtained custody of Child shortly after she was born.  The orphans' court explained:

> [Child] has been in kinship foster care[, with her maternal grandfather and maternal step-grandmother (Maternal Grandparents),] since discharge from the hospital after her birth. At birth, she showed signs of withdrawal from Mother taking suboxone and marijuana.  More urgent was Mother calling the mental health crisis team on herself which led to an Emergency Protective Order for [C]hild on September 15, 2022[,] and a Shelter Care Hearing Order on September 16, 2022[,] which placed [C]hild in [Maternal Grandparents'] care upon discharge.

---

[1] The orphans' court also terminated the parental rights of Child's father, G.W. (Father), whose "whereabouts are unknown."  **See** N.T. Vol. I, 6/14/24, at 2.

[Child] was adjudicated dependent on September 22, 2022…. She has never returned to [Mother's] care.

Orphans' Court Opinion (OCO), 8/16/24, at 1.

On March 14, 2024, CYS petitioned to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). The orphans' court held a hearing on June 14, 2024. CYS presented testimony from clinical psychologist, Dr. Carolyn Menta; visitation supervisor, Lisa McDade; visitation supervisor, Lauren Wilson; and CYS caseworker, Danielle Thomas. Mother presented testimony from parenting service provider, Lee Ann Risha; behavioral health counselor, Ashley Wellington; and CYS program specialist, Jayme Shaffer. Mother also testified in opposition to termination.

The orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). On July 2, 2024, Mother timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother presents the following issue for review:

DID THE [ORPHANS'] COURT ABUSE ITS DISCRETION IN TERMINATING THE PARENTAL RIGHTS OF [] MOTHER, A.R., AS [CYS] FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN ITS BURDEN OF PROOF?

Mother's Brief at 3.

*Discussion*

A petitioner must present clear and convincing evidence "that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). This Court has explained:

- 2 -

> Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the ... ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted). "[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents." *In re S.P.*, 47 A.3d 817, 826 (Pa. 2012) (citation omitted).

The Adoption Act sets forth the procedure for termination of parental rights, and provides for a bifurcated analysis. *See* 23 Pa.C.S. § 2511. "Initially, the focus is on the conduct of the parent[, and the petitioner] must prove … that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *In re Adoption of N.N.H.,* 197 A.3d 777, 783 (Pa. Super. 2018) (citation omitted). "Only if the court determines that the parent's conduct warrants termination … does the court engage in the second part of the analysis pursuant to Section 2511(b)." *Id.* Under Section 2511(b), the court must assess evidence of the child's needs and welfare, "giving primary consideration to the developmental, physical and

emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

*Section 2511(a) Grounds for Termination*

Mother argues CYS "failed to present clear and convincing evidence in support of any of the enumerated grounds to terminate [her] parental rights, because [Mother] had been actively engaged with CYS … developing her parenting skills, and maintaining a bond with [C]hild." Mother's Brief at 14. In response, CYS argues that despite its "reasonable efforts…, the issues which led to [Child's] placement continue to exist, as set forth in the statute." CYS's Brief at 6.

This Court "need only agree with [the orphans' court] as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we consider subsection 2511(a)(2), which provides grounds for termination when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for h[er] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). The petitioner must prove the parent's "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse,

neglect or refusal cannot or will not be remedied." ***In re A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Pertinently, these grounds "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id.***

The orphans' court observed that the "issue in this case is the mental instability of Mother." OCO at 11. At the termination hearing, CYS presented expert testimony from clinical psychologist, Dr. Carolyn Menta. Dr. Menta performed a parental capacity evaluation of Mother, which she described as an examination of "what characteristics stand in the way of [Mother] parenting in a healthy and effective manner." N.T. Vol. I at 4.[2]

Dr. Menta found that Mother's "mental health was a significant concern," because Mother is "not always in touch with reality." ***Id.*** at 7-8. Dr. Menta explained:

> [Mother] demonstrated some clinical paranoia and serious mood disturbances which would be consistent with [Mother's diagnosis of the] bipolar type of schizoaffective disorder. So, there was even some delusional thinking. She had also been through a lot of trauma[,] but because her cognition was so impaired due to the psychosis, it wasn't possible to really delineate how much of her paranoia might be due to trauma and how much might be due to her mood disorder.
>
> ***
>
> [Mother] had some issues with feeling that somebody was trying to break into her home, calling the police to check out things, and nothing was ever [] found. … It was her illness that was causing

---

[2] There are two transcripts from the June 14, 2024 hearing. We refer to the transcript from the morning as "N.T. Vol. I" and the transcript from the afternoon as "N.T. Vol. II".

those symptoms.  So, if somebody is not entirely in touch with reality, it's very, very difficult for them to parent in an effective manner because they're responding to internal stimuli[, which] can be very confusing for a child who sees a parent being fearful … and the child can begin to feel unsafe and can take on some of those anxieties and fears….

*Id.* at 7, 8-9.

Dr. Menta opined that in Mother's "specific case, I did not feel that she could parent on a full-time basis." *Id.* at 10.  The orphans' court accepted Dr. Menta's Parental Capacity Report into evidence, without objection, as Exhibit 1.  *Id.* at 17-18.

CYS also presented testimony from the caseworker, Danielle Thomas, who began working with the family on October 3, 2022.  N.T. Vol. II at 39.  Ms. Thomas stated that Mother's "goal plan has not been altered in any way since its creation and that was back in October of 2022."  *Id.*  Ms. Thomas noted that Mother "has maintained cooperation and … communication."  *Id.* at 40.  Nonetheless, she explained:

I had to develop a kind of baseline for [Mother].  We would often play reality and make-believe.  …  She struggles with grasping reality at all times and she struggles with portraying her feelings appropriately.  So a lot of the time[,] the concern I had was [Mother] talk[ing] about the rapture a lot, about it's going to happen, she wishes she would just be dead, would ask me if I felt that way.  [Mother o]ften believed there were listening devices in her house.  She was consistently concerned with people being possessed by demons, myself included[, and v]irtually everybody in the [c]ourt case.

*Id.* at 40-41.

Ms. Thomas testified that Mother had "been in mental health [treatment] since her teenage years," but "no longer wanted to [take] medication." *Id.* at 45. She added:

[Mother] was attending mental health [services] but she vocalized very quickly that she did not believe in mental health diagnoses. She did not believe what she was diagnosed with was correct[,] and from the very beginning[,] claimed that [mental health diagnoses] did not apply to her. … [Mother is] compliant with services that she's currently involved in[, although] she has a pattern of changing mental health providers.

*Id.* at 46-47.

Ms. Thomas expressed "concerns for [Mother's] mental health," and stated "there are times that I am worried about her." *Id.* at 51. Ms. Thomas stated that Mother "never had the ability to parent for a full 24 hours." *Id.* at 54.

Mother presented testimony from her behavioral health counselor, Ashley Wellington. Ms. Wellington relayed Mother's counseling goals of establishing "healthy coping skills for her emotions and stressors, … work[ing] on effective communication in her personal relationships to contribute to building healthy and social relationships, and … recall[ing] traumatic events without being overwhelmed by negative emotions." *Id.* at 9. Ms. Wellington stated that she assisted Mother "by linking her to different resources, [and] encouraging her to engage with supports, [and] to get involved with different community groups." *Id.* at 10.

Mother presented additional testimony from Jayme Shaffer, who is employed by CYS as a "program specialist." *Id.* at 57. Ms. Shaffer stated that she met Mother in July 2023, when Mother "became part of our Women's Group." *Id.* at 58. Ms. Shaffer has helped Mother with "advocacy." *Id.* at 59. Ms. Shaffer stated that she has "seen growth" with Mother, but also testified that Mother "definitely still has things that she needs to work on with her mental health." *Id.* at 60.

Mother testified that addressing her mental health "is a lifetime goal." *Id.* at 68. Mother confirmed where she lives, and described her home as "easy to break into." *Id.* at 72. She stated, "I don't believe I'm safe, but I would like to, I'm planning on getting out of there." *Id.* at 73. Mother recounted feeling unsafe in her home since moving there in 2022. *Id.* at 87.

Mother's attorney asked Mother whether she "can meet [Child's] basic needs?" *Id.* at 82. Mother answered that she has "dealt with mental health all my life and I'm not on any medication that creates episodes for me and doesn't make me spontaneously suicidal." *Id.* Mother stated that she "never threatened to hurt [her]self," although she expressed being upset with "things [she] can't control." *Id.* at 80, 82.

At the close of testimony, the orphans' court described termination of parental rights decisions as "the toughest … a judge ever has to make." *Id.* at 91. However, the court recognized it "must go on [the evidence] presented." *Id.* The court stated that "Mother's mental health is a significant

concern," with Mother "suffering from paranoia and the stress of a home she cannot manage." OCO at 7, 10. The court explained:

> Despite trying her very best to complete her goals, Mother simply lacks the parental capacity to nurture and raise [C]hild. … Mother has failed to perform parental duties during the entire life of this child. Although there is no question that Mother loves [Child], such continued incapacity has caused [Child] to be without parental care necessary for [her] physical and mental well-being.

*Id.* at 11.

As indicated above, the record supports the orphans' court's determination that Mother's incapacity to parent has caused Child to be without essential parental care, and the causes of the incapacity "cannot or will not be remedied." *In re A.H.*, 247 A.3d at 443. Thus, we discern no error in the termination of Mother's parental rights under subsection 2511(a)(2).

*Section 2511(b) Needs and Welfare*

With respect to Child's needs and welfare, Mother asserts, "[o]verall, the testimony of Lee Ann Risha, Lauren Wilson, and Danielle Thomas show that a strong bond exists between [Mother] and [C]hild, a bond that should not be severed by terminating [Mother's] parental rights to [C]hild." Mother's Brief at 25. Mother argues:

> Dr. Menta's opinion is based only upon observing [Mother's] interactions with [C]hild for approximately one hour. On the other hand, Lee Ann Risha, Lauren Wilson, and Danielle Thomas have observed [Mother's] interactions with [C]hild for months, and their opinion of [Mother's] bond with [C]hild should be given significantly more weight.

*Id.*

CYS counters that "the credibility of witnesses and all conflicts in testimony are to be resolved by the [orphans' court,] as finder of fact." CYS's Brief at 7 (citing *In re A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002)). CYS also emphasizes "the permanency needs of [C]hild." *Id.* at 8.

Section 2511(b) states that the court, "in terminating the rights of a parent[,] shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). Notably, our Supreme Court has instructed that "courts considering termination must also consider whether the child[ is] in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

Here, Dr. Menta conducted a bonding assessment of Child with Mother, and Child with Maternal Grandparents. Dr. Menta examined "the nature and quality of the attachment[s]." N.T. Vol. I at 4. Dr. Menta testified:

> What I observed was [Child] was engaged in play with [M]other[,] but quite often[,] if [M]other picked her up or pull[ed] her close[,] [Child] would disengage. She would squirm away, she would turn away, [or] walk away. So, kind of frequently throughout the evaluation[, Child] would kind of move away from [M]other. I found that to be notable because … that was very different from [Child's] behavior with [Maternal G]randparents[,] in which she

- 10 -

typically moved toward them, she was standing very close to them[,] particularly her grandmother. She would get right up close to her face and look into her eyes. She was saying she loved her grandmother. She was much more engaged in physical touch with [Maternal Grandparents] as opposed to [M]other…. So, ultimately, my impression … is that she did not have a secure attachment with [M]other. Ultimately, it appeared to be a rather anxious attachment. And individuals with an anxious avoidant attachment style tend to avoid getting closely connected to others, they tend to be very independent…. This will lead to relationship problems later in life, throughout their lifetime. They can have problems in terms of family relationships, [and] romantic relationships. They often find themselves in co-dependent relationships and they are emotionally – poorly adjusted.

In contrast, [Child] had a very secure attachment with her grandparents as evidenced by her behavior with them[,] particularly her grandmother. I would say she's slightly more attached to her grandmother than her grandfather, but both were a secure attachment. And secure attachments are important because they help the child to have confidence, a sense of security, a stable sense of self, and it helps them to grow up to have stable relationships and healthy relationships. So ultimately, I determined that it would be in [Child's] best interest to be able to sustain that secure bond with her grandparents and potentially severing the insecure attachment with [M]other. The risks associated with that would be outweighed by the benefits of maintaining the bond with the grandparents. The risks associated with severing an insecure attachment can harbor temporary anxiety, temporary sadness, but also in the interest of the long term good for [Child,] there's so much good that can be gained from maintaining that stable, secure attachment.

*Id.* at 11-12. The orphans' court accepted Dr. Menta's Bonding Assessment into evidence, without objection, as Exhibit 2. *Id.* at 17-18.

Lisa McDade, the visitation supervisor, expressed concern with Mother's behaviors during visits with Child. She stated that "overall, visits go well, [but Mother] needs a couple breaks." N.T. Vol. II at 16. Ms. McDade stated that Mother "feels overwhelmed" and "needs a breather." *Id.* at 17. In such

instances, Ms. McDade would remain with Child. *Id.* She explained that Mother's breaks were permitted "due to her mental health." *Id.*

Ms. McDade also stated that Mother "tends to shut down at times." *Id.* at 27. She explained:

> [Mother] would tell me I'm just very stressed. I need a break. She had asked me a few times in the past to end visits early, [because] she's too overwhelmed. She's canceled visits because she [was] so overwhelmed[, and] she's cancelled a visit [after] she called me one day saying that someone had broken into her house and sexually assaulted her, but then refused to go to the ER to get checked out.
>
> ***
>
> She has talked to me about the rapture. She has cancelled visits in the past because she believed it was happening and did not want to be outside. She has in the past talked about people breaking into her home and recording her and watching her….

*Id.* at 21-23.

Ms. McDade relayed that at one point, Mother was bringing food to visits, "but … disclosed to [Ms. McDade] that she believed the food in her home was being poisoned." *Id.* at 19. After that incident, there was "a stipulation that she could not bring any food." *Id.* Ms. McDade also testified that in May 2023, Mother stated "she just wished she was dead," which prompted Ms. McDade's call a crisis resource due to "concern with her harming herself." *Id.* at 29-30. Ms. McDade last supervised a visit in May 2024, and expressed her view that Mother's parenting showed "minimal improvement." *Id.* at 24.

The other visitation supervisor, Lauren Wilson, began supervising Mother's visits with Child in February 2024. *Id.* at 32. She stated that "most

parts" of the visits "[we]re good," and described Mother as "a very good mom when she is good." *Id.* at 32, 37. Ms. Wilson also testified that Mother "gets overwhelmed and will ask to take her 15-minute break." *Id.* at 33. She recognized that Mother becomes "maxed out at three hours." *Id.* at 35. Ms. Wilson testified that Mother "is a good mom, caring, but if it was 24-7, at this state [*sic*], I don't know." *Id.* at 37.

In response to the visitation supervisors' testimony, Mother described the visits as "exhausting with three hours because it's very small, the room." *Id.* at 75. She also stated that she took breaks to go to the bathroom or smoke a cigarette, and did "not always le[ave] due to the fact of being stressed out." *Id.* Mother conceded there were "a few times [when she] felt overwhelmed," but claimed "it's very rare." *Id.* at 86. She also stated, "it's not [Child] that overwhelms me[,] it's outside stressor[s] that I can't control." *Id.* at 87. Mother testified that she opposed termination because "it would be hard to be in [Child's] life and I believe she adores me just as much as I adore her." *Id.* at 84.

Mother also presented testimony from Lee Ann Risha, who works at A Child's Place and began providing Mother with parenting instruction in February 2023. N.T. Vol I at 29. Ms. Risha described Mother as "very accepting of all the things that we've talked about and [Mother is] very willing to try every activity…." *Id.* at 28. In addition, Ms. Risha observed some of Mother's visits with Child, and described Mother as affectionate, responsive, and encouraging. *Id.* at 24.

It is undisputed that Child has been in Maternal Grandparents' care since birth. Ms. Thomas testified that Maternal Grandparents are a permanency option for Child. *Id.* at 50. She described their home as "appropriate," and Child as "happy" and "well cared for." *Id.* at 49, 55. According to Ms. Thomas, termination of Mother's parental rights was in Child's best interest because "the conditions that lead to the placement of [Child] have not been alleviated after the time that she's been in care." *Id.* at 50.

Consistent with the testimony, the orphans' court found that termination served Child's needs and welfare. The court observed that Maternal Grandparents' "household revolves around [Child, and t]hey stand as a permanency option." OCO at 6. The court explained:

> [Child's] best interest requires her safety and stability in the pre-adoptive home to continue, the only home she has ever known. The court finds that the best interest, needs and welfare of [Child] requires termination of parental rights and adoption into a loving and stable home where she is bonded and secure. Mother has failed to perform parental duties during the entire life of this child. Although there is no question that Mother loves [Child], such continued incapacity has caused her to be without parental care necessary for [her] physical and mental well-being. This situation cannot be remedied by continued dependency involvement by th[e c]ourt.

OCO at 11.

Our review reveals no error, as the record supports termination of Mother's parental rights pursuant to Section 2511(b).

Decree affirmed.

- 14 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 02/20/2025