J-A29013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN RE: ADOPTION OF: S.R.A., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.W.A., III, FATHER | : : : : : : : : | |
| | : | No. 913 WDA 2025 |

Appeal from the Order Dated June 25, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  102 of 2024

| IN RE: ADOPTION OF N.R.A., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.W.A., III, FATHER | : : : : : : | |
| | : | No. 914 WDA 2025 |

Appeal from the Order Entered July 9, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 103 of 2024

BEFORE:  OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.:                     **FILED: March 9, 2026**

Appellant, R.W.A., III ("Father"), appeals from the orders that involuntarily terminated his parental rights to four-year-old S.R.A and three-year-old N.R.A (collectively, "Children"), pursuant to 23 Pa.C.S. § 2511(a) and (b).  Upon review, we find that the record is devoid of clear and convincing evidence to terminate parental rights pursuant to Section 2511(b) and, therefore, we are constrained to vacate and remand for further proceedings.

The following procedural and factual history is relevant to this appeal. Children's mother, M.A.A. ("Mother"), has an extensive history with child welfare agencies in various counties due to illegal drug use, homelessness, and child neglect. Mother has a total of thirteen children, eleven of whom have been removed from her care. Mother and Father are engaged in an on-again, off-again romantic relationship. The Westmoreland County Children's Bureau ("the Agency") has been involved with the family since March of 2020 due to numerous referrals regarding Mother's and Father's illegal drug use, lack of supervision of Children, and inadequate housing. Additionally, Father has a traumatic brain injury and resulting intellectual disabilities. On June 23, 2023, the trial court adjudicated Children dependent and implemented court-ordered supervision after the family refused to cooperate with services. On June 28, 2023, the Agency obtained emergency custody after Children and their older two siblings, then ranging in age from infant to nine years old, were spotted at a local Dollar General Store without adult supervision begging for food. Children were left outside the store in strollers with soiled diapers. Video surveillance showed the older siblings attempting to open cans of food in the store and one of the older siblings smoking a vape pen. Children and their two older siblings all exhibited extremely poor hygiene. Notably, Children tested positive for cocaine and methamphetamines, presumably from drug residue in the home. Children were placed in foster care where they remain.

Father was ordered to comply with random drug screens, undergo a drug and alcohol evaluation and comply with recommendations, participate in recommended parenting classes, maintain stable, appropriate and clean housing, and maintain a legal and verifiable source of income.

The trial court held regular permanency review hearings and consistently found Father's compliance to be minimal. On November 22, 2024, the Agency filed petitions to involuntarily terminate Father's parental rights to Children. The trial court appointed Emily K. Trisoline, Esq., to serve as legal counsel as well as guardian *ad litem* ("GAL") for Children, after finding there was no conflict in Attorney Trisoline serving in the dual role.

The trial court held hearings on May 1, 2025, and May 29, 2025. With regards to Father, the Agency presented testimony from Jean DeFilippis, owner of ARC Point Labs; Richelle O'Malley, part-owner of In-Clusion, LLC; Jena Clair, visitation supervisor at UPMC Western Behavior Health at Mon-Yough; Veronica Stein, Assistant Director of Sunrise Step-by-Step Parent Education; Shelly Weaver, counselor at In-Clusion, LLC; and Karyl Piper, Agency caseworker.

Ms. DeFilippis testified that her company attempted to screen Father for drug and alcohol use 176 times and that 65 attempts were unsuccessful. She testified that Father tested positive 34 times for cocaine and methamphetamine. Ms. DeFilippis explained that Father's most recent positive screen was on April 25, 2025, a week prior to the first day of termination proceedings. She testified that Children were tested for illegal

substances one and two days after being removed from Mother's care. S.R.A and N.R.A. tested positive for methamphetamine and cocaine, J.D.C. and G.T.N. tested positive for cocaine. She explained that the tests showed that Children were exposed to these substances more than once in the three-month period prior to Children's removal from Mother's care.

Dr. O'Malley conducted an interactional evaluation between Father and Children in July of 2023 when Children first came into the custody of the Agency. Dr. O'Malley rated Father's "insight and judgment" as "poor" due to Father's denial of his substance abuse and failure to understand why Children were not in his custody. N.T. Hr'g, 5/1/25, at 40. Dr. O'Malley testified that Father was not particularly interactive during the evaluation and failed to identify safety risks. Dr. O'Malley recommended hands-on parenting instruction and nutrition training.

Ms. Clair testified that she supervised visits between Father and Children and offered parenting classes to Father. Ms. Clair testified that Father attended 31 out of 65 visits and 12 of 18 parenting sessions. Ms. Clair testified that she had concerns regarding Father's ability to focus, retain information, and maintain attention towards Children for long period of time. Ms. Clair testified that Father would play with Children appropriately and when Father was consistently visiting with them, Children would exhibit an "increased level of affection" towards Father. *Id.* at 113. Ms. Clair testified that Father would cuddle with Children during some visits and Children would occasionally cry when visits ended.

Ms. Stein testified that her agency began to work with Father in November 2024 to offer services to assist with Father's traumatic brain injury, including parenting classes and supervised visitation. Ms. Stein testified that Father attended 7 out of 13 visits. She reported that Father made minimal progress and that she would have safety concerns if Father's visits were changed to unsupervised.

Ms. Weaver testified that her agency was contracted twice to provide "non-offender treatment"[1] to Father and to offer general counseling and to work with Father on "healthy relationships within the family unit and with the kids." *Id.* at 166. Father was non-compliant, attending 10 out of 31 offered sessions. Father was unsuccessfully discharged twice.

Ms. Piper testified that, in totaling the number of visits offered by the three agencies, Father attended 87 out of 183 visits. She testified that Father has made no progress to resolve any of the issues which brought Children into foster care. Ms. Piper testified that the Agency is recommending termination of Father's parental rights.

Ms. Piper testified that Children are placed together in a pre-adoptive home with their older sibling. Ms. Piper testified that the foster parents are meeting Children's needs and that Children are involved in an early head start program. She testified that Children are up to date with all necessary medical appointments and attend school regularly. Ms. Piper testified that the foster

---

[1] It is unclear from the record what "non-offender treatment" refers to.

family meets all of Children's "needs developmentally, physically, and emotionally" and Children are all "observed to have a close relationship with their foster families[.]" *Id.* at 208. Ms. Piper testified, "[a]ll [C]hildren are observed to be happy, healthy. They're doing well. . . . Previously on occasion there would be some behavioral concerns after visits [but] since the parents are visiting minimally, if at all, there have been no behaviors reported." *Id.* at 209. She testified that Children "often cry and hide when they know it's time to go for a visit" with parents. *Id.* at 210. Ms. Piper stated that Children have a "strong" relationship with their foster parents and are "happy" in the home. *Id.* at 212.

On June 24, 2025, the court issued an order and opinion involuntarily terminating Father's parental rights to Children pursuant to Sections 2511(a)(2) and (b) of the Adoption Act.[2] Children's GAL agreed with this disposition.

Father timely appealed. Father complied with Pa.R.A.P. 1925(b). The trial court filed a Rule 1925(a) opinion relying on its June 24, 2025 order and opinion.

Father raises a sole issue for our review: "Whether the trial court erred in finding by clear and convincing evidence that [the Agency] met its burden under 23 Pa.C.S. [] § 2511(b)?" Father's Br. at 4.

---

[2] The trial court terminated the parental rights of Mother, who pursued a separate appeal at Docket Nos. 915 WDA 2025, 916 WDA 2025, 917 WDA 2025, and 918 WDA 2025.

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent."

- 7 -

*L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and internal quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "[I]nitially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

Instantly, Father fails to raise a challenge to Section 2511(a) in his brief to this Court and, therefore, we deem any challenge to be waived.

Accordingly, we review the order pursuant to Section 2511(b) only. *See Interest of: J.R.R.*, 229 A.3d 8, 12 (Pa. Super. 2020) (explaining that a failure to raise a challenge to Section 2511(a) in an appellate brief will result in waiver and prompt this Court to review Section 2511(b) only).

With respect to Section 2511(b), our Supreme Court has recently explained that the "primary consideration must be the child's developmental, physical and emotional needs and welfare." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citing 23 Pa.C.S. § 2511(b); some quotation marks omitted). "Notably, courts should consider the matter from the child's perspective, placing [his or] her developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* This determination must be made on a case-by-case basis with the court considering each child's special needs. *Id.* at 1105-1106. Our Supreme Court has interpreted the "emotional needs and welfare of the child . . . to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and internal quotation marks omitted). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent "does not preclude the termination of parental rights." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must

examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. In other words, "[c]ourts must determine whether the trauma caused by breaking that bond is outweighed by the benefit of moving the child toward a permanent home." *T.S.M.*, 71 A.3d at 253. "Moreover, by evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's 'feelings' or 'affection' for the parent, which even badly abused and neglected children will retain." *K.T.*, 296 A.3d at 1110–11 . "Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.* at 1114.

"The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care []; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* at 1113.

Father avers that the trial court erred when it terminated his parental rights pursuant to Section 2511(b). Father's Br. at 10. Father argues that the evidence shows that a bond exists between himself and Children and that

the Agency failed to demonstrate the impact of severing that bond. *Id.* at 13. Father contends that terminating his parental rights to Children "would destroy a necessary and beneficial relationship[.]" *Id.*

Our review of the trial court's Section 2511(b) analysis reveals that the court focused entirely on Father's failure to engage in services and lack of progress toward reunification, rather than the needs and welfare of each child to determine if termination of Father's parental rights was in Children's best interest. The court failed to make any findings regarding each child's bond with Father and, if any bond exists, the impact of severing it; each child's need for permanency; each child's bond with their foster family; and each child's needs and welfare within the foster home. Moreover, the record is lacking with clear and convincing evidence in this regard.

Accordingly, we are constrained to vacate the orders terminating Father's parental rights to Children. We remand for the court to hold a hearing forthwith upon remittal of the certified record for the parties to present evidence regarding the "developmental, physical and emotional needs and welfare" of each child pursuant to Section 2511(b), including evidence regarding parent-child bond. The trial court shall then conduct a proper analysis pursuant to 23 Pa.C.S. § 2511(b), as described *supra*.

Orders vacated. Case remanded for proceedings consistent with this decision after receipt of the certified record, which we direct the Prothonotary to remit immediately. Jurisdiction relinquished.

- 11 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/09/2026