J-A13043-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: A.S., A MINOR | : IN THE SUPERIOR COURT OF |
| | :       PENNSYLVANIA |
| | : |
| APPEAL OF: S.S. MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 67 WDA 2026 |

Appeal from the Decree Dated December 4, 2025
In the Court of Common Pleas of Indiana County
Orphans' Court at No: 32-25-0424

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: June 4, 2026**

S.S. (Mother) appeals from the decree which granted the petition of Indiana County Children and Youth Services (Agency) and terminated her parental rights to A.S. (Child).[1]  We affirm.

*CASE HISTORY*

Child was born in June 2022.  She was approximately 20 months old when she came into the Agency's care.  The orphans' court explained:

> [I]n April of 2024[, t]he Agency received a report detailing concerns of mental health instability for Mother[,] inadequate housing conditions, and domestic violence.  [C]hild was removed from the care of Mother … and a shelter care hearing was held on May 9, 2024.  The shelter care application was granted, and [C]hild remained in her emergency foster home placement.
>
> An adjudication and disposition hearing was held on June 13, 2025.  [C]hild was adjudicated as a dependent child and ordered

---

[1] The orphans' court also terminated the parental rights of Child's father, C.B. (Father).

> to remain in her … licensed foster home placement. Mother was recommended to complete a parental / protective capacity evaluation, complete a full psychological evaluation, obtain and maintain stable housing, complete domestic violence / couples' counseling, complete parenting training, and engage in medication management.

Orphans' Court Opinion (OCO), 12/4/25, at 1-2 (footnote omitted). The court conducted regular permanency review hearings, and found after each hearing that Mother had complied only minimally with the recommended services, and thus made minimal progress toward alleviating the conditions which led to Child's placement.

On August 5, 2025, the Agency petitioned to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). The orphans' court held hearings on October 23, 2025, and November 20, 2025. The Agency presented expert testimony from a clinical psychologist, Dr. Carolyn Menta; and the Agency's caseworker, Jessalyn Pahel. Mother presented testimony from family resource specialist, Victoria Lutz; Mother's behavioral health counselor, Christina Bush; and Mother's father, R.S. (Maternal Grandfather). Mother also testified in opposition to termination.

Although Child was a toddler, she was represented by legal counsel and a guardian *ad litem* (GAL). Legal counsel indicated that Child was "unable to articulate a position" about termination, while the GAL advocated for termination as being in Child's best interest.

On December 4, 2025, the orphans' court entered the decree terminating Mother's parental rights. In its accompanying opinion, the court

credited the "uncontradicted expert testimony of Dr. Menta," as well as the testimony of the Agency's caseworker, Ms. Pahel. *Id.* at 30.

On January 5, 2026, Mother timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i). Mother presents the following question:

> Whether the [orphans' c]ourt erred in terminating [Mother's] parental rights to [C]hild because the Agency failed to meet its burden by clear and convincing evidence[?]

Mother's Brief at 3. Mother claims the "evidence demonstrates [Mother] had been making positive strides in regards to her parental duties, and that termination of her parental rights was not in [C]hild's best interests." *Id.* at 7.

The Agency counters that the orphans' court "properly performed the necessary bifurcated analysis." Agency's Brief at 7. The Agency states that Mother "is instead challenging" the orphans' court's credibility determinations "as lacking support through clear and convincing evidence." *Id.* We agree.

*DISCUSSION*

The Agency was required to present clear and convincing evidence that its asserted grounds for termination were valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). This Court has explained:

> Where the [orphans'] court's factual findings are supported by the evidence, an appellate court may not disturb the ... ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court

may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. This standard of review reflects the deference we pay to [orphans'] courts, who often observe the parties first-hand across multiple hearings.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted).  Unlike orphans' courts, "appellate courts are not equipped to make the fact-specific determinations on a cold record, where the … judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents." ***In re S.P.***, 47 A.3d 817, 826 (Pa. 2012) (citation omitted).

The Adoption Act sets forth the procedure for the orphans' court's analysis.  ***See*** 23 Pa.C.S. § 2511.  "Initially, the focus is on the conduct of the parent[, and the petitioner] must prove … that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." ***In re Adoption of N.N.H.,*** 197 A.3d 777, 783 (Pa. Super. 2018) (citation omitted). "Only if the court determines that the parent's conduct warrants termination … does the court engage in the second part of the analysis pursuant to Section 2511(b)." ***Id.***  Under Section 2511(b), the court must assess evidence of the child's needs and welfare, "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).  This Court "need only agree with [the orphans' court] as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

*Section 2511(a) Grounds for Termination*

We examine the orphans' court's finding of grounds for termination under Section 2511(a)(8). Under Section 2511(a)(8), the petitioner must establish: (1) the child has been removed from the care of the parent for at least twelve months; (2) the conditions which led to the removal or placement of the child still exist; and (3) termination of parental rights best serves the needs and welfare of the child. ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 49 (Pa. Super. 2024). Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the child's placement. ***Id.***

Mother does not specifically address Section 2511(a)(8). Rather, she claims she was "making positive strides," and that the orphans' court "erred in its reliance on the testimony" of Dr. Menta. Mother's Brief at 7, 12. Mother notes that the caseworker, Ms. Pahel, had "some bright spots in favor of [Mother], which the [orphans' c]ourt should have considered." ***Id.*** at 14. In addition, Mother refers to the testimony of her behavioral health counselor, Ms. Bush, who noted Mother's "attendance has been 'moderate'" and "testified that [Mother's] communication skills were improving …, and she was also making progress on her mental health issues." ***Id.*** at 18. Mother's argument fails because she disregards the orphans' court's discretion "to believe all, part, or none of the evidence," and "make all credibility determinations." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

The orphans' court explained that Mother's "persistent and profound mental health issues [we]re at the core of the court's decision." OCO at 6. The court noted that Dr. Menta had performed an initial parental and protective capacity evaluation of Mother on August 23, 2024, and issued a report on September 5, 2024, followed by an updated parental and protective capacity evaluation on May 21, 2025, with an accompanying report dated June 5, 2025. *Id.* at 3 (stating that both reports were "marked and admitted" into evidence); *id.* at 7 (stating that Dr. Menta "conducted a clinical interview of Mother, employed several assessment measures, and reviewed information from many collateral sources.").

Dr. Menta testified that a parental and protective capacity evaluation "looks at any obstacles to a parent's ability to parent effectively and also to protect their child and to recognize things that could harm their child." N.T., 10/23/25, at 11. Dr. Menta noted Mother's history of domestic violence, financial instability, and criminal activity, but focused on her behavioral and psychiatric history. Dr. Menta discussed Mother's diagnoses of bipolar and personality disorders, and explained that Mother "externalized blame" and "minimized her role" in Child's placement. *Id.* at 14. According to Dr. Menta, Mother lacked the "appropriate parental capacity" to care for Child. *Id.* at 22. The orphans' court summarized:

> Dr. Menta testified consistently with her reports. Specifically, Dr. Menta testified that she was concerned with Mother's ability to protect [C]hild following the first evaluation. Dr. Menta then testified regarding her conclusions following the updated evaluation; Dr. Menta stated that she did not observe progress,

the same consistent concerns exist, and Mother continues to minimize concern and was somewhat manipulative. Finally, Dr. Menta stated that Mother does not have the appropriate parental and/or protective capacity to have [C]hild in her care.

OCO at 12.

The orphans' court also credited the testimony of Ms. Pahel, who "stated that after all of these months, Mother is attempting to address the same concerns that were identified 16 months ago, *i.e.*, there has been no progress." *Id.* at 20. The court noted Ms. Pahel's testimony "that during the life of the case, Mother was discharged from services with JusticeWorks Youthcare and discontinued services with [Southwestern Pennsylvania Human Services]." *Id.* Ms. Pahel also testified that Mother had not obtained stable housing, participated in domestic violence counseling, or made much progress with treating her mental health. N.T., 10/23/25, at 71. Although Mother had attended some counseling sessions, Ms. Pahel stated, "it's clear that what she's working on in her sessions does not follow outside into the real world." *Id.* at 73. Ms. Pahel expressed concern that Mother "tested positive for methamphetamines" in 2024, and "may possibly have a dependency on [prescription] medication, [but] she has refused to take a drug screen." *Id.* at 77. Ms. Pahel noted that three months prior to the termination hearing, in July 2025, Mother refused to take a drug test. *Id.* Ms. Pahel testified that around the same time, during a meeting with Mother and service providers in the summer of 2025,

> Mother … appeared very disheveled. Her eyes were sunken. She had dirty clothes, dirty hair and fingernails. She often looked to

[Father] for an answer. When I attempted to ask her if she had a medical marijuana card, I had to ask her multiple times. She appeared confused, [and] looked at [Father]. She stated that she did have one, but she has yet to present it. And then whenever I talked to her a few weeks later, she attempted to say that none of that happened….

*Id.* at 80. According to Ms. Pahel, Mother would "talk about things that didn't occur" and "has a deluded thought process." *Id.* at 81.

After discussing the testimony of Dr. Menta and Ms. Pahel, the orphans' court concluded:

Mother [is] suffering from mental health conditions. [She] ebb[s] and flow[s] through life, trying to navigate financial instability, lack of housing, unemployment, family relationships, family crises, and [a] volatile relationship with [Father]. ... After 18 months, Mother is still trying to "keep her head above water." Mother has limited insight into her role in creating this situation …. While all of this is happening, [C]hild is waiting for permanency.

OCO at 27. Accordingly, the court found grounds for termination under Section 2511(a)(8), where Child had been removed from Mother's care for more than twelve months, the conditions which led to removal continued to exist, and termination was in Child's best interest.

*Section 2511(b) Needs and Welfare*

With respect to Child's needs and welfare under Section 2511(b), Mother references her testimony about her "positive interaction and bond" with Child, and the testimony of Maternal Grandfather, who "testified that he would be a placement option for [C]hild, and that [Mother] and [C]hild had a positive

relationship." Mother's Brief at 18, 20. Again, Mother disregards the orphans'
court's discretion in assessing the evidence.

Section 2511(b) provides that the orphans' court, "shall give primary
consideration to the developmental, physical and emotional needs and welfare
of the child." 23 Pa.C.S. § 2511(b). Intangibles "such as love, comfort,
security, and stability are involved in the inquiry into the needs and welfare
of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation
omitted). The orphans' court must "discern the nature and status of the
parent-child bond, with utmost attention to the effect on the child of
permanently severing that bond." *Id.* (citation omitted). The court must also
"consider whether the child[ is] in a pre-adoptive home and whether they have
a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

Again, the orphans' court credited the testimony Dr. Menta and Ms.
Pahel. Shortly before the hearing, Dr. Menta conducted a bonding assessment
which was entered into evidence as Exhibit 5. *See* N.T., 10/23/25, at 39. The
court explained:

> Dr. Menta performed a Bonding Assessment for the purpose of
> assessing the bond between [C]hild and Mother. The Bonding
> Assessment was performed on October 14, 2025, and the
> resulting written report is dated the same day. … Dr. Menta
> interviewed Mother and conducted an observation of Mother and
> [C]hild. With regard to the existence and nature of the bond
> between Mother and [C]hild, Dr. Menta conclude[d] that [C]hild
> "appears to have an anxious / ambivalent attachment to
> [M]other." Dr. Menta then refers to the secure attachment [C]hild
> has with the foster parents, and states that it is in [C]hild's "best
> interest to maintain that secure attachment." Dr. Menta
> concludes[, "t]he benefits of severing her anxious attachment to

- 9 -

[M]other are far outweighed by maintaining the secure attachment with her foster parents."

OCO at 28-29 (citations omitted).

The orphans' court also recounted Ms. Pahel's testimony that Child "was non-verbal when she came into the foster home; [C]hild is now verbal and her speech has improved." *Id.* at 22. The court noted Ms. Pahel's testimony that Child "receives physical therapy, occupational therapy, early intervention, and wrap-around services." *Id.* Moreover,

> [Ms. Pahel] stated that the foster parents and [C]hild have a parent / child relationship that is trusting, nurturing, and loving. Ms. Pahel detailed the physical and emotional improvement experienced by [C]hild in the foster home. Ms. Pahel concluded by stating that it would be in [C]hild's best interest to terminate the parental rights of Mother….

*Id.* at 30.

We discern no abuse of discretion, as the record supports the orphans' court's determination that termination of Mother's parental rights served Child's needs and welfare.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/04/2026